## Brooke et al. *v.* City of Philadelphia et al.

*Municipalities—Debt—Sinking fund—Constitutional limit.*

Under section 8, article 9 of the constitution, which declares that " the debt of any city shall never exceed seven per cent of the assessed value of the property therein," the debt of a city is properly ascertained by subtracting from its total indebtedness the amount of the certificates of the funded debt of the city held in the sinking fund.

Section 3 of article 15 of the constitution, which directs that " every city shall create a sinking fund which shall be inviolably pledged for the payment of the public debt," is sufficiently complied with whenever the commissioners of the sinking fund purchase the required portion of the funded debt of the city.   In such a case the inviolable pledge of the fund to the extent of the purchase is kept; that much of the sinking fund has been in fact applied in payment of the funded debt.

Securities other than those of the city in the sinking fund are merely an asset of the city, and do not operate to the reduction of the funded debt. They merely represent the savings of the city, set aside in anticipation of payment of the debt.

It is immaterial, in determining the actual debt, that the commissioners of the sinking fund have no authority, immediately on purchase, to cancel or destroy the city certificate.

*Duties of commissioners of sinking fund.*

If payments are not made into the sinking fund for the redemption or purchase of the funded debt as required by law, the commissioners must see to it that such payments are made, even to the institution of legal proceedings to compel annual payment by the city.

*Loan of the city's credit to a corporation.*

An agreement between a city and a railroad company, by the terms of which the city is to construct a subway for the railroad so as to avoid grade crossings, and the railroad company is to reimburse the city to the amount of one half the expenditure, is not a loan of the city's credit to the railroad company in violation of section 7, article 9, of the constitution.

Mr. Chief Justice Sterrett filed a dissenting opinion.

Argued May 4, 1894.   Bill in equity No. 10, July T., 1894, by Francis M. Brooke, Jesse Lea and William L. Supplee, plaintiffs, against the city of Philadelphia, Edwin S. Stuart, Mayor, and Thomas M. Thompson, City Controller, defendants.   Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ.

Bill to enjoin issuance of certificates of indebtedness.

The facts appear by the opinion of the Supreme Court.   The case was heard on bill and answer.

*Mayer Sulzberger*, for appellants, cited: Const. art. 9, §§ 4–16; art. 15, §§ 1–3; Adams on Public Debts, pp. 343, 375; Bouvier, L. Dict., Pledge; Act of April 20, 1874, § 5, P. L. 65, defining indebtedness; Acts of May 23, 1874, § 11, P. L. 234; May 11, 1893, § 11, P. L. 42.

*James Alcorn*, assistant city solicitor, and *Charles F. Warwick*, city solicitor, for appellee, cited: Wheeler v. Phila., 77 Pa. 338; Acts of Feb. 2, 1854, P. L. 41; May 13, 1857, P. L. 489; April 20, 1874, P. L. 65; May 23, 1874, P. L. 234; March 23, 1877, P. L. 36; June 11, 1879, P. L. 137; May 26, 1891, P. L. 127; May 11, 1893, P. L. 42; Gratz v. R. R., 41 Pa. 447; Com. v. Reading, 15 W. N. 529; Bank v. Grace, 102 N. Y. 313; Terry v. Bank, 18 Wis. 93; Board of Liquidators of City Debt v. Municipality No. 1, 6 La. 21; Speer v. School Dist., 50 Pa. 150; Hilbish v. Catherman, 64 Pa. 154; R. R. v. Phila., 47 Pa. 189; Wilkes-Barre City Hospital v. Luzerne County, 84 Pa. 55.

OPINION BY MR. JUSTICE DEAN, May 31, 1894:

As the contention here affects large public interests, an early final determination of it ought to be had; therefore, at the request of both parties, we have taken original jurisdiction of plaintiff's bill.

The plaintiffs are citizens and taxpayers of Philadelphia.  They aver that the city councils, by ordinance approved March 15, 1894, authorized the creation of a city loan of $6,000,000, for the purpose of ridding the city of steam railroad grade crossings on twenty-four public streets from Broad to Thirtieth, all

crossings of the Philadelphia and Reading Railroad. The power of the city to make such a municipal improvement is not questioned, nor is its power, within certain constitutional limits, to create a debt by loan or otherwise to accomplish the purpose, denied. It is averred, however, that the debt of $6,000,000, authorized by this ordinance, when added to the existing debt of the city, will largely exceed the constitutional limit of municipal indebtedness, and is, therefore, illegal.

It is further averred that the ordinance, authorizing said loan, discloses the fact that the money in part is to be expended in an improvement for the advantage of the railroad company, which company is by contract to reimburse the city in an amount equal to one half the expenditure, or $3,000,000; that to this extent it is a loan of the city's credit to a corporation, and the creation of the additional debt, for that reason, is, under the constitution, unlawful.

The city denies that if $6,000,000 be added to its existing actual debt, that debt will exceed the amount authorized by the constitution. It further denies that its contract with the railroad company is, in any correct ascertainment of the meaning of the constitution, a loan of its credit to the corporation.

Section 8, article 9, of the constitution, declares that : " The debt of any city shall never exceed seven per cent of the assessed value of the property therein, nor shall any such municipality incur any new debt or increase its indebtedness to an amount exceeding two per centum upon such assessed valuation of property without the assent of the electors thereof at a public election, in such manner as shall be provided by law ; but any city, the debt of which now exceeds seven per centum of such assessed valuation, may be authorized by law to increase the same three per centum, in the aggregate, at any one time upon such valuation."

This follows immediately after section 7 of the same article, which section prohibits the legislature from authorizing any municipality becoming a stockholder in any corporation, or loaning its credit or money to any corporation, association or individual.

There were no such restrictions on legislative authority or on municipal power in the constitution of 1838 ; and while not a few profound lawyers, because of the sparseness of restric-

tions in that constitution and the multiplicity of them in our present one, think the old superior to the new, we doubt if any one condemns the policy disclosed in sections 7 and 8 of article 9, regulating and limiting municipal debts. The twenty years preceding the adoption of the constitution of 1874 was an era of great growth and expansion in easy and rapid modes of communication and transportation ; highways, such as railroads, plank roads and turnpikes, were multiplied. Almost every municipal organization sought to promote the construction of them to, from and through the municipal limits. They subscribed for the securities of these corporations, sometimes beyond their ability, and generally beyond their subsequent willingness to pay. Not seldom the courts were impelled, at the suit of importunate creditors, to enforce the assessment and collection of taxes for payment of such debts, by the imprisonment of municipal officers. Litigation, too, in more than one case demonstrated that increased ability to pay was not followed by increased willingness to pay such debts. The debt of one county in this commonwealth, for the larger part made up of subscriptions to the stock and bonds of railroad corporations, reached nearly forty per cent of its assessed valuation. The basis of such debts was almost wholly speculative, for, when contracted, there was no traffic and no experience in the new enterprise, which demonstrated any value to its securities. Prompted often by the wildest hopes of future municipal wealth and prosperity on the completion of the new highway, the county, city or borough rushed into indebtedness to promote it. This propensity was characterized by an eminent writer on municipal law, Judge DILLON, as " an epidemic insanity inducing extravagant corporate subscriptions to public works." The result of this insanity is shown by the fact that in 1860 the fourteen principal cities of the United States had an aggregate indebtedness of only $109,808,409; fifteen years afterwards, the aggregate debt of the same cities was $407,218,351. The debt had increased 271 per cent, the population only 70 per cent.

To this sort of debt there was added during the war large loans for bounty purposes, so that, in 1873, when the constitutional convention was in session, if there was one evil more prominent and exasperating than another to the taxpayer, it

was the big debt of his particular locality; a debt often out of all proportion to its ability to pay. The convention struck at this evil when they framed sections 7 and 8 of article 9 of the constitution. The people of the commonwealth struck at it when, by a large majority, they adopted the constitution. They fixed what they deemed the reasonable limit of municipal debt at seven per cent of the assessed valuation. But we do not concur with the learned counsel for plaintiff, in his most able argument, that the real intent and policy of the constitution of 1874 was to establish or promote, except debt for temporary purposes, absolute non-indebtedness for cities, counties and boroughs; to inaugurate a new and " pay as you go " system. If his assumption be correct, there would seem to be no escape from his conclusion, viz.: that no new debt ought to be incurred while any part of the old remains unpaid. But it seems to us the obvious intention of sections 7 and 8 of article 9, and section 3 of article 15, is to authorize a continuous debt, not exceeding seven per cent of the assessed valuation. In these sections the constitution plainly says, to all the municipalities of the commonwealth, " You may owe seven per cent of what you are worth ; if you want to spend more than this, then you must pay as you go, for you shall not at any one time, in the aggregate, be in debt beyond this amount." As to the commonwealth itself, the intention was to wipe out the existing debt, and thereafter permit the incurring of only a limited amount of debt on grave exigencies, and that only temporarily. But as to the municipal subdivisions of the state, the necessity for a reasonable debt, for municipal improvements, was recognized ; the constitution sought only to limit the aggregate amount of it at any one time, and to provide for the gradual payment of any such debt incurred for any particular purpose, within a period of thirty years.

On this theory, the borrowing power, within the seven per cent limit, would practically never be wholly exhausted; for whenever the debt to this amount was created, the process of extinction would commence, leaving in a short time a margin for further loans. The constitution did fix, somewhat arbitrarily perhaps, but nevertheless fixed, the limit of indebtedness at a sum which the people thought a reasonable indebtedness. They determined that no municipality thereafter should create

a debt which practically bankrupted it, or a debt which imposed on the taxpayer a burden too grievous to be borne.

The contention here, then, turns on what is the present actual debt of the city. The amount of uncanceled, undestroyed evidences of debt, it is not disputed, is $52,758,845.22; the assessed valuation of the taxable property of the city is $769,930,542. Seven per cent of this amount would leave only a margin of about one million more than the amount of uncanceled evidences of debt; if this evidence of debt which once existed still constitutes part of the real debt of the city, the $6,000,000 loan is in violation of section 8, article 9, of the constitution. It is averred by defendant that these uncanceled certificates are not conclusive of the real debt of the city,—that it is actually much less. That, of the $52,758,845.22 apparent debt, $23,130,100, made up of 6, 4 and 3 per cent loans of the city, is in the sinking fund, purchased by the city's money; deducting this amount from the apparent debt, leaves only $29,628,745 as the real debt, but little more than four per cent of the assessed valuation, and adding the proposed loan to this, the whole real debt would not exceed five per cent of the assessed valuation.

A debt is defined by lexicographers to be, "That which one person is bound to pay to or perform for another." Are the city securities in the sinking fund still a debt owing by the city, and which she is still bound to pay? Bouvier defines a sinking fund as "A fund arising from particular taxes, imposts or duties, which is appropriated toward the payment of the interest due on a public loan, and for the gradual payment of the principal." The mere definition of the term, however, helps but little in the determination of the meaning of the word "debt" in the constitution; for, whatever technical definition be given the name applied to the fund, the status of the obligations in it must be determined by the legislation, state and municipal, which put them there. The first appearance of city legislation on the subject, is an ordinance of March 12, 1807, Allinson & Penrose's Philadelphia, p. 121. It is entitled "An ordinance for the reduction and payment of the debts of the city." It provides that $5,000 shall be set aside annually as a sinking fund, to be applied to the purchase and redemption of the funded debt of the city at its market price, not exceeding par,

until the debt should be redeemed; if the securities could not be purchased at par, then the city treasurer was authorized to purchase for the fund six per cent bonds of the United States. Many ordinances were adopted in subsequent years, having reference to the same subject, and disclosing the same purpose in substantially the same language; then, in 1854, came the " consolidation " act, which provided " that the net debt of the county of Philadelphia, after deducting and canceling that portion in the sinking fund," and the net debts of the several districts and municipalities incorporated with the city, after deducting and canceling the portions held by their respective sinking funds, should be consolidated into one debt, to be called " the debt of the city of Philadelphia; " further, that there should be annually raised by tax, in addition to the income from corporate property, a sum sufficient to pay the interest on the consolidated debt. It was further enacted: " No debt shall be incurred or loans made by the said city, without a contemporaneous appropriation of a sufficient annual income or tax, exclusive of loans, to pay the interest and sink the principal of such debt in thirty years." The consolidation act, in declaring what shall be called " the debt of the city of Philadelphia," says that that portion of the debt in the sinking fund shall first be deducted in an ascertainment of the amount of the debt. It recognized the certificates in the fund as still existing, but not existing as part of the consolidated debt.

This was supplemented by a number of ordinances in the years following consolidation, all in harmony with the act, and intended to raise annually a sum sufficient to pay the interest and sink the principal of the funded debt in thirty years. The act of 1857 prohibited the use of the investments in the sinking fund for any other purpose than sale for money or exchange for city loans, and directed that when sold or exchanged, " the proceeds should be applied exclusively to the sinking fund or to the extinguishment of the funded debt." Then came section 3, article 15 of the constitution of 1874, which directs that : " Every city shall create a sinking fund which shall be inviolably pledged for the payment of the public debt." " Every city shall create a sinking fund,"—that is, there shall be set apart from all other city money, for a specific purpose, the redemption or payment of the funded debt, a portion of the an-

nual revenues of the city; then, when this portion of the revenues reaches the fund, it is inviolably pledged for the payment of the funded debt. No temptation however great, no necessity however imperious, shall move the city to divert one dollar of the fund to a purpose other than the redemption or payment of the debt. The word "pledged" is to have, in its connection here, not a technical legal definition, but its obvious meaning, that of a solemn promise, which, under no possible circumstances, shall be violated. The acts of 1874 and 1879 regulating the incurring of municipal debts and the funding of the same, direct the annual levy and collection of a tax sufficient to pay, in addition to the interest, the principal of the debt in thirty years.

So far, then, as relates to the general public, among whom are these plaintiffs, what is called the sinking fund is the mere conduit, through and by which the money raised by annual taxation reaches its destination; it goes into the fund for a specific purpose, to which it is inviolably pledged; when there, the commissioners must see to it that it accomplishes its purpose, the payment of the funded debt of the city; when, with that end in view, they from time to time purchase any portion of the funded debt of the city, then the inviolable pledge of the fund, to the extent of the purchase, is kept; that much of the sinking fund has been, in fact, applied in payment of the funded debt.

As set out in appendix to plaintiffs' paper-book, there are now in the sinking fund, 6 per cents city loan, $14,233,350; 4 per cents, $1,949,750; 3 per cents, $6,947,000; altogether, $23,130,100 of city certificates purchased by the commissioners. There are, besides these, other securities, not those of the city, in the fund. As to these last, obviously, they remain in the fund, bound by the inviolable pledge which attached to them when they first became part of it. So far as concerns them, they have not yet been applied in payment or redemption of any part of the funded debt. An asset of the city, easily convertible into cash, they undoubtedly are, but as yet they have not operated to the reduction of the funded debt, to which purpose they were pledged. In effect, they only represent the savings of the city, set aside in anticipation of payment of the debt; as to any actual reduction of the debt by them, there

has been none; the debt is still an outstanding liability unaffected by the savings, with only an increased ability on part of the city to pay; an increase in ability measured by the cash value of the savings. When used in purchase of the debt, there is a release of the pledge, and a discharge of the obligation, to the amount of the purchase.

It is not important in determining the actual debt, that the commissioners have not authority, immediately on purchase, to cancel or destroy the city certificate; it is paid for by the money of the obligor, put into the fund for that very purpose; as an outstanding, unpaid obligation, it can, as to the obligor, have no real effective existence after it is purchased and paid for with the city's money. And although the city, in this issue, only claims to deduct from the apparent debt the amount of 6 per cent certificates in the sinking fund, every city certificate in that fund representing a part of the funded debt, and purchased by the commissioners in the redemption or payment of that debt, ceases to be longer a part of the actual debt of the city. That much of the debt the city is no longer bound to pay, because practically it is paid. We are speaking now of the actual obligation of the city as affected by these certificates in the fund, but not yet canceled.

If payments be not made into the fund for the redemption or purchase of the funded debt, as required by law, the commissioners must see to it that such payments are made, even to the institution of legal proceedings to compel annual payment by the city. The commissioners, in our view of their duty, are not, as has been suggested in the argument, mere city clerks or bookkeepers; they are invested with high powers, involving very weighty responsibilities.

All the legislation, both state and municipal, to which we have referred, is saturated with the one idea that the sinking fund is a plan or scheme, by and through which the funded debt of the city shall annually be reduced by redemption or payment of the evidences of the debt outstanding, that is, the certificates.

If, then, the commissioners purchase for the fund any portion of the city loans, and they are no longer, as affects the city, a liability, are the certificates so purchased, even though not canceled, to be treated as an actual existing debt of the city? As

between the city and its creditor who has parted with his money on the apparent promise of an ordinance, that these purchased certificates should not be canceled, but should remain in the fund until the maturity of the loan, he has the right to insist on the letter of his contract, whether there be any substantial benefit to him therefrom or not.  He is entitled to his right under his contract, without impairment in a particular which he deems important; if he relied on a form, without substance, when he loaned his money, it is not for the city, which promised him not to cancel before maturity, to question his right or violate its promise by canceling as soon as paid.  But the contention between the creditor and the city, as to when the certificates may be lawfully canceled or destroyed, is a wholly different one from that before us.  Suppose, as is argued, another creditor loaned his money on the express stipulation of the ordinance that this purchased certificate should not be canceled until the maturity of the loan of which it was a part.  Very well, let this be so; at most, this second, creditor has two securities instead of one for his debt; the one in his pocket, the other uncanceled in the sinking fund.  But that adds nothing to the real debt.  If a creditor have twenty securities of his debtor for a $1,000 loan, the debtor's liability is determined, not by the aggregate of securities, but by the amount he actually owes, which is $1,000, not $20,000.

The city owes now just what it is bound to pay; not one cent more.  If it has, through the sinking fund, purchased its own certificates, placed them uncanceled in the fund, and even pays interest on them annually, it cannot pay them again.  The payment of annual interest is only a method or device for the annual appropriation to the fund.  To illustrate further, suppose the city were to resolve to lay a tax sufficient to pay its whole funded debt this year; what sum should it raise?  If it assumed, as averred by plaintiffs is the fact, that its real debt is $52,758,845.22, which includes the city certificates in the sinking fund, it would then collect from the people $23,130,100 more than it could pay out; uncanceled certificates to this amount, it is true, are in the sinking fund, but they have been already bought by the city's money under the sinking fund plan for the payment of the funded debt, and belong to the city.  Manifestly, she would have raised $23,130,100 more than her

debt, more than she was "bound to pay or perform," under the definition of debt, already quoted; but if a tax of five per cent would raise enough money to pay every debt she is bound to pay, as is not disputed, then her debt is two per cent within the constitutional limit.

While this question is here raised for the first time in this state under the constitution of 1874, a case almost the same was decided by the New York court of appeals, Bank v. William R. Grace, Mayor, et al., 102 N. Y. 313. Section 11, article 8, of the constitution of that state has this provision: "No county containing a city of over one hundred thousand inhabitants, or any such city, shall be allowed to become indebted for any purpose, or in any manner, to an amount which, including existing indebtedness, shall exceed ten per centum of the assessed valuation of the real estate of such city or county subject to taxation." In 1886, the date of the suit, the authorized funded debt of the city and county of New York was $126,000,000; the assessed value of real estate was $1,168,443,137; the debt was therefore apparently in excess of the constitutional limit; but more than $34,000,000 of the city certificates had been purchased for and were in the sinking fund; deducting these, from the whole funded debt, left the debt $24,000,000 less than ten per centum of the assessed valuation of real estate. The plaintiffs complained that the city was about to issue a loan of $2,000,000 for the improvement of docks, and, counting the certificates in the sinking fund as part of the debt, this was a violation of the constitution. They therefore prayed for an injunction restraining such issue. The case was most ably and elaborately argued, both in the lower courts and in the court of appeals, which last named court held: That the intent of the constitutional prohibition was aimed "at an actual, not a theoretical indebtedness,—at a substantial liability which can only be discharged by the enforcement of a tax or an assessment, which, when levied, will be a charge upon the taxpayer, and a burden for him to remove— not a formal obligation which may remain as evidence of a once existing debt, but which can, in no way, be regarded as a present debt to be enforced, and which, if not before canceled by the commissioners, becomes waste paper by the mere efflux of time." Therefore the court held that the certificates

purchased for the sinking fund were not a debt against the city, to be computed in the ascertainment of the amount within the constitutional limit, and dismissed the bill.

While we are not bound by the judicial construction put upon the New York constitution, yet the prohibition there is so nearly like unto ours, and the case was so exhaustively discussed in all its aspects by prominent counsel, then carefully considered by a court eminent for its learning and ability, that we cannot but give persuasive weight to the judgment, vindicated as it is, it seems to us, by the soundest reasoning.

As to the second averment of the bill, that the debt to be created, to the extent of one half, is practically a loan of the city's credit to the Philadelphia and Reading Railroad Company, a private corporation, we are of the opinion that it cannot be sustained. The avoidance of grade crossings is not only desirable, but, with the growth of the city in business and population, may be considered absolutely necessary. The maimings and deaths incident to grade crossings, the records of this court show, are increasing every year ; a densely populated city, bisected by a steam railroad at grade, suffers a serious interruption to travel on its streets, permits within its limits a constant menace to life and limb. Under such circumstances, it is the city's duty to rid itself of such an obstacle to its growth, and of 'a danger always imminent. It has the unquestioned power to do so, if there be no legal right on the part of the railroad company interfered with ; if there be such right, then it has power to make terms with the corporation, by which the corporation waives its right. And the city has the power to assume the entire expense of the municipal improvement; if the corporation, in view of advantages to it, agrees to reimburse the city to the amount of one half the expenditure, the transaction is, in no sense of the words, a loan of the city's credit to the corporation. The city makes an improvement which is a great public necessity; which largely enhances the valuation of its taxable property ; it makes it at its own expense, which it has the undoubted power to do. The corporation, which is also benefited, but which is not impelled thereto by any legal obligation to the public, makes a contribution to the city of one half the cost of the improvement. It thereby obtains no loan of the city credit; simply reimburses

the city for an expenditure from which the corporation was greatly advantaged.

We hold: (1) That the $23,130,100 of city certificates in the sinking fund is not a debt within the meaning of the word "debt" in section 8, article 9, of the constitution; that the real debt of the city is the authorized debt, less the amount of the city certificates purchased and uncanceled in that fund. (2) The agreement of the city with the Philadelphia & Reading Railroad Company is not a loan of the city's credit to a corporation.

The bill is dismissed at the costs of plaintiffs.


DISSENTING OPINION BY MR. CHIEF JUSTICE STERRETT:

This taxpayer's bill, brought against the city of Philadelphia, and the mayor and controller thereof, charges in substance:

(1) That the creation of the $6,000,000 loan, authorized by the ordinance of March 15, 1894, will increase the debt of the city nearly $5,000,000 above the constitutional limit of "seven per centum upon the assessed value of the taxable property therein," in violation of section 8, article 9, of the constitution.

(2) That about $3,000,000 of the proceeds of said loan is to be expended for the use and benefit of the Philadelphia & Reading Railroad Company in such way as to be in fact an appropriation of money for or a loan of its credit to said railroad corporation, in violation of section 7, article 9, of the constitution; and prays that said defendants be enjoined from placing said loan, etc.

In my opinion these charges are abundantly sustained, and the injunction, as prayed for, should issue on both grounds.

Section 8, of article 9, above referred to, declares: "The debt of any . . . . city . . . . shall never exceed seven per centum upon the assessed value of the taxable property therein," etc.

The history of this constitutional limitation and kindred provisions, among which is section 3, of article 15, ordaining that, "Every city shall create a sinking fund which shall be inviolably pledged for the payment of its funded debt," is too familiar to require extended comment. They were intended to remedy the then great and growing evil of excessive municipal indebtedness, and consequent oppressive taxation. The latter was the

inevitable result of the former, and the obvious if not the only remedy was a reasonable limitation on municipal indebtedness. That was finally fixed at " seven per centum upon the assessed value of the taxable property therein," and became a part of the fundamental law. This limitation was of course intended for the protection of taxpayers, because the direct effect of the evil to be remedied was upon them. It was considered, by the framers of the constitution, that, in addition to taxation for the ordinary current expenses of municipal government, property owners should not be further taxed to any greater extent than is necessary to pay interest on a municipal debt, not exceeding the seven per cent limit, and to maintain a sinking fund pledged for the payment of said debt at maturity. For example, if the debt of a given city—upon which it is annually paying interest and also. maintaining a sinking fund for the purpose of paying the principal at maturity—amounts to " seven per centum of the assessed value of the taxable property therein," it has reached the ultimate limit of its borrowing power, and must remain in that condition until a borrowing margin is created by reduction of its funded debt or increase of its assessed valuation.

It is conceded that the present outstanding indebtedness of the city defendant is $52,578,845.22, or nearly up to the seven per cent limit. On every dollar of that sum it is not only paying interest, but, for the purpose of paying the principal of the several loans, at maturity, it is also making quarterly payments to the commissioners of the sinking fund, which fund the city, by contract with its loanholders, created and inviolably pledged to them for the payment of said loans at maturity. The fund thus created, and to the gradual increase of which the city bound itself to its loanholders, was committed to the custody and management of three persons called commissioners of the sinking fund, whose duty it is to invest and reinvest the same, etc., until the maturity of the corresponding loan, and then apply the same to the payment thereof·in full, if the fund be sufficient—if not, then pro rata. Said commissioners are, in fact and in law, trustees of the said fund and the securities which represent it,—trustees for both the city and its loanholders, but primarily for the latter until their claims are paid. Each and every loanholder has a substantial equitable interest

in each and every dollar of the fund and securities which represent it.   The legal title to the fund, including the securities belonging thereto, is in said commissioners.   Within the lines of their authority as trustees they have absolute control of it. The city has no more right to the custody and control of the securities than the loanholders have, and not as much.   The sinking fund is now represented by securities amounting in round numbers to $25,000,000, about $14,000,000 of which are in certificates of the city, six per cent loans, in which the commissioners are authorized to invest; but those city sixes are no more the property of the city than are the United States bonds or other securities in which the sinking fund is invested.   In view of the authority of the commissioners to sell and reinvest, non constat that the same securities will represent the fund when the corresponding loan matures.

As we have seen, the funded debt of the city, including the securities held by the commissioners of the sinking fund, on all of which it is paying and must continue to pay interest until the corresponding loans respectively mature, is $52,578,845.22, nearly up to the seven per cent limit.   If the proposed $6,000,000 loan is placed, the funded interest-bearing debt of the city will be $58,578,845.22, or about $5,000,000 in excess of the seven per cent limit.   That excess will, of course, necessitate an additional requisition on the taxpayers of the city for an amount sufficient to pay the interest on said excess and provide for the payment of the principal at maturity.   This would be a clear violation of the constitutional limitation, both in letter and in spirit.   If it is not, there is no good reason why the excess may not be increased to the extent of $25,000,000—the amount of securities in the sinking fund.   The only justification or excuse that is suggested for this manifest violation of one of the most valuable safeguards of the constitution is that the city, in ascertaining the amount of its debt, has a right to deduct from its funded debt, on which it is now paying and must continue to pay interest, the amount of the city sixes now owned and held by the commissioners of the sinking fund, thus reducing its so-called real debt to about $44,575,845.22.   This proposition is as unsound as it is novel.

What are we to understand by the word " debt " as employed in the section above quoted ?   As everybody would naturally

understand it, the debt of a city is the aggregate amount of its outstanding obligations or promises to pay. A debt is defined to be " that which is due from one person to another, whether money, goods or services, and whether payable at present or at a future time." As defined by the Century Dictionary, indebtedness is (1) " The state of being indebted without regard to the ability or inability to pay the debt." (2) " The amount owed—debts collectively ; as the indebtedness of an individual or a corporation." Surely the word " debt " ought to embrace and does embrace at least all obligations or promises to pay, upon which interest is payable and is actually paid at stated times. As employed by the framers of the constitution, and the people by whom it was adopted, the phrase " debt of any city," etc., was undoubtedly intended to mean at least all interest-bearing obligations or promises to pay.

As to the second ground : Conceding, to the fullest extent, the meritorious character of the purpose for which the proceeds of the $6,000,000 loan is to be used (the reconstruction by the city of part of the Philadelphia & Reading Railroad, in which that company is confessedly interested to the extent of at least $3,000,000, which it promises to pay or secure to the city), the undisputed facts sufficiently show that at least the sum last named is to be expended for the use and benefit of said company in such way as to be in truth and in fact neither more nor less than an appropriation of money for or a loan of the city's credit to said railroad corporation, in violation of section 7, article 9, of the fundamental law.

Time will not permit the discussion of this point. For reasons above suggested, I would award the injunction.