**Ralph BARRINGTON et al., Appellants,**

v.

**Jimmie P. COKINOS et al., Appellees.**

No. 6278.

Court of Civil Appeals of Texas.

Beaumont.

June 4, 1959.

Rehearing Denied July 23, 1959.

Second Motion for Rehearing Denied
Oct. 19, 1960.

E. B. Votaw, Vidor, for appellants.

Keith, Mehaffy, McNicholas & Weber, King, Sharfstein & Rienstra, Strong, Moore, Pipkin, Strong & Nelson, Beaumont, Hutcheson, Taliaferro & Hutcheson, Houston, George Murphy, City Atty., Beaumont, for appellees.

ANDERSON, Chief Justice.

Between them, the City of Beaumont, which is a home-rule city, and the State of Texas have agreed to finance the removal of a span of Missouri Pacific Railroad Company's railroad from its present location in the City to another. The City is to furnish the new right of way and is to pay all other expense of the project in excess of $550,000. The State, through its Highway Department, is to have the work done and is to contribute $550,000 toward the expense of it.

The new right of way is to be adjacent to, and in part is to be, right of way that is now held by the Texas and New Orleans Railroad Company. Subject to that company's rights, the City is to acquire, in its own name, title to all of the right of way that can be purchased upon acceptable terms and is then to convey the right of way to Missouri Pacific Railroad Company in fee. It is also to furnish the company with a policy of title insurance. So much of the right of way as cannot be purchased upon acceptable terms is to be condemned

by the railroad company, but at the City's expense. When all of this has been done, the Texas and New Orleans Railroad Company is to quitclaim to Missouri Pacific Railroad Company so much of the former's right of way as is involved in the project. And when the new span of railroad has been completed and has been accepted by Missouri Pacific Railroad Company as being in accordance with plans and specifications that have been agreed upon, that company is to abandon the supplanted portion of its existing right of way through the City of Beaumont and is to quitclaim it to the City.

The covenants of the parties are contained in two interdependent contracts, one of which is between the City and the two railroad companies, and the other of which is between the City, the railroad companies, and the State. The undertakings of the City are covered by the former of the two; those of the State, by the latter.

Although not of the same date, the contracts became effective at the same time and each refers to the other for supplementation. By its own terms, the one bearing the earlier date was not to become effective until the other one had been signed. The contract to which only the City and the railroad companies are parties bears date of December 17, 1957. The other one, which is referred to in the instruments themselves as the work contract, is dated January 29, 1958.

The contracts do not themselves touch upon how the City is to finance its undertakings, but the City proposes to use the proceeds of tax bonds authorized at a bond election in 1950. Some of the bonds—$500,-000 worth—were sold early in 1958 and others will be sold if additional money is needed.

The validity of the contracts and the right of the City to expend proceeds of the bonds or any other of its funds in carrying out the contracts are the matters in issue.

The suit was brought by appellants against the City, the City's mayor, councilmen and manager, and the two railroad companies. In their own behalves and in behalf of all others who, like themselves, own taxable property in the City, appellants sued to have the contract of December 17 declared invalid and for a permanent injunction restraining the City and its officials from taking any further steps toward discharging the City's commitments under the contract. They challenged the validity of the contract upon a number of grounds, but primarily upon the ground that what the City has agreed to do is prohibited by Article 11, Sec. 3, of the State Constitution, Vernon's Ann.St. Appellants also sought to permanently enjoin the City and its officials from using proceeds of the bonds as contemplated, even if the contract of December 17 is valid, it being their position that the project to which the contract applies is not within the purpose for which the bonds were voted. The defendants answered by general denials and by specially pleading not only the contract of January 29 but the general background of both contracts. This background supplied the City's and the State's reasons for entering into the contracts. The City and its officials also cross-acted against the plaintiffs, praying for a declaratory judgment adjudging the contracts to be valid and the City's proposed acts under or pursuant to them to be legally permissible. Except as to some of the injunctive relief that was sought, the plaintiffs' suit was also brought under the Uniform Declaratory Judgments Act, Article 2524–1, Vernon's Texas Civil Statutes. Trial to the court, without a jury, resulted in a judgment denying the plaintiffs any relief and granting to cross-plaintiffs the relief for which they prayed. The judgment went into some detail in adjudging the contracts valid and in according judicial sanction to the contemplated acts of the City and its officials. The plaintiffs and cross-defendants duly perfected their appeal.

The State's interest in relocating the span of railroad stems from a desire on the part of its Highway Department to eliminate one of two overpasses that otherwise will be necessary in a freeway the Highway Department, aided by the City, is constructing through the City of Beaumont. If the railroads are not placed together so that one overpass can span both, two overpasses in close proximity to one another will be essential not only for safety's sake but in order that federal aid for the freeway can be obtained. The Highway Department has concluded that, as between the two alternatives, the proposed method of handling is both preferable from an engineering standpoint and cheaper. Its views are shared by the City.

The City is immediately interested in furthering the freeway project, but it also has a much broader interest in relocating the span of railroad. The latter project is in keeping with a comprehensive plan the City and various railroad companies have agreed upon for a more or less general relocation of railroads and railroad facilities within the City's corporate limits. And this general change is something the City, its officers, and its citizenship have long sought to bring about.

As things are now, the main lines of several railroads crisscross the City, crossing, first and last, at grade level, virtually all of the City's most heavily travelled streets. The two with which we are directly concerned pass completely across the City along east-west courses and in fairly close proximity to one another; and, with one exception, they cross all streets in their paths at grade level. The railroads are all heavily used and trains of great length pass along them frequently. Collisions between trains and street vehicles occur often in the City and a constant hazard to life and property exists from that source. But of even greater concern to the citizenship in general, perhaps, is the way in which the trains impede and disrupt street traffic under normal conditions, especially in the City's principal business district. Then, too, the railroads and their ancillary tracks interfere in various ways with an orderly development of the City. Because of them, streets cannot be opened, extended and connected as public need demands and neither business nor residential areas of the City can expand in accordance with what would otherwise be their normal patterns.

Public discontent with the situation has been acute for many years and there has been much agitation for a change. Studies looking to an improvement of conditions have been conducted from time to time by the City and other public agencies, and cooperation by the railroad companies in solving the problem has been solicited by the City repeatedly. The companies have been content with existing conditions or have at least been unwilling to assume the burden of changing them. Finally, however, they have agreed with the City to cooperate in relocating some of their tracks and in effecting grade separations at numerous rail and street intersections. And it is to further this larger project as well as the freeway project that the City has entered into the contracts here involved and is endeavoring to discharge its commitments under them. The City perhaps also contemplates that it may eventually open a street along the portion of Missouri Pacific's existing right of way that is to be supplanted, but procurement of right of way for such a street does not appear to have been a primary inducing cause of its having entered into the contracts.

Section 3 of Article 11 of the Constitution, which appellants contend renders the contract of December 17 invalid, is as follows:

"No county, city, or other municipal corporation shall hereafter become a subscriber to the capital of any private corporation or association, or make any appropriation or donation to the same, or in anywise loan its credit; but this shall not be construed to in any

way affect any obligation heretofore undertaken pursuant to law."

■ It does not, in our opinion, render either of the contracts invalid. A loan of the City's credit is definitely not involved, because neither of the railroad companies has become or is to become indebted to the City or to anyone else as a result of the contracts or of the transaction to which the contracts appertain. And we are just as convinced that the City has not become and is not to become a "subscriber to the capital" of the companies, since it neither owns nor is to own stock or any interest in either company. We are also of the opinion, of course, but for less succinct reasons, that the City has not made and does not propose to make, within contemplation of the constitutional prohibition, either an appropriation or a donation to or for the benefit of the companies. ¡We shall endeavor to explain our views in this respect, first with reference to why a donation is not involved.

That which is yielded up pursuant to contract and in return for a valuable consideration cannot, in our opinion, be properly considered a donation, and we are satisfied that in this instance the City's contractual commitments are supported by a valuable consideration. In order that its own interests and those of the State might be served, the City desired that the railroad companies part with vested interests in their existing rights of way and relinquish such rights, privileges and advantages as are theirs under present conditions. The companies were under no duty or compulsion to do so and had no intentions of doing so through self-interest; but, more or less as an accommodation to the City, they agreed to do so upon certain conditions which the City was willing to meet. The elements of a valid contract are therefore present, at least prima facie; and, unless the contracts are ultra vires for some other reason, we think it clear that the City is not in the attitude of making a donation.

■ Our conception that a donation is nothing more nor less than a gratuity—that which is bestowed without receipt or expectation of anything in return—is perhaps rendered suspect by the opinion in City of Cleburne v. Gulf, C. & S. F. Ry. Co., 66 Tex. 457, 1 S.W. 342; but we do not believe that it is thereby rendered untenable. We shall endeavor by explanation to justify our belief, but desire first to bring back into the picture the matter of whether an appropriation, within contemplation of the constitutional prohibition, is involved; it being our view that the word "appropriation" and the word "donation" are used in the constitutional provision (art. 11, sec. 3) in essentially the same sense, the former having been employed to make clear that gratuities of a municipality's revenues as well as gratuities of land and other tangible property are prohibited.

■ We cannot be sure that in City of Cleburne v. Gulf, C. & S. F. Ry. Co., supra, there was even the semblance of a valuable consideration for the city's undertakings, but it is no doubt proper to assume that there was. In any event, the court said that the constitutional provision in question "deprived municipalities of the power to make such contracts"—reference being to contracts under which the consideration for a municipality's assumption of obligations was a railroad company's agreement to route its railroad through or near the municipality. And from that sentence alone, of course, it can be argued that the presence or absence of a valuable consideration for a city's acts is not of controlling effect in determining whether, within contemplation of the constitutional prohibition, an appropriation or a donation, or at least the former, has or has not been made or attempted. It can also be argued, with some degree of plausibility, that the case differentiates between an appropriation and a donation more than we are disposed to do. However, we are of the opinion that in reality the case supports neither argument. There was no oc-

casion for the court to differentiate between an appropriation and a donation, because the matter of whether the city's acts constituted the one if not the other was not involved. The court did take the position that, despite whatever consideration there may have been for the city's acts, the appropriation there involved was such a one as is prohibited by Article 11, Sec. 3, of the Constitution, and so the case perhaps does appear to inveigh against our conclusion that only gratuitous appropriations are prohibited. We are convinced, though, that in fact there was no consideration for the appropriation and that therefore the case is not necessarily inharmonious with our views. It may be safely assumed, we think, that affirmative statutory or constitutional authority for doing what the City of Cleburne had done or attempted was considered necessary, because in 1871 a general law was passed allowing any county, city or town to donate or subscribe bonds and do certain other things to aid railway construction. Acts 1871, 12th Leg., p. 29, ch. 37; Gammel's Laws of Texas, Vol. 6, p. 931. Such authority was lacking when the bonds were issued, because the Act of 1871 had been repealed in 1874, except as to specified counties. Acts 1874, 14th Leg., p. 118; Gammel's Laws of Texas, Vol. 8, p. 120. Without regard to Article 11, Sec. 3, of the Constitution, therefore, the city was without authority to issue its bonds for the purposes for which the bonds were issued; this, simply because that power was not among those that had been conferred upon it. Granted, then, that the bonds were issued pursuant to a contract that ostensibly bound the railroad company to route its railroad through the City of Cleburne, they still were issued without consideration, because the contract was ultra vires and void. There was only the semblance, not the reality, of consideration. The bonds were therefore clothed with the attributes of a gratuity and did fall within the ban of the constitutional provision in question, though recourse to that provision would not have been necessary in order to hold them invalid. We cannot be sure, of course, that the foregoing or a comparable line of reasoning accounted for the court's conclusion that the appropriation was prohibited by the provision, but we are disposed to believe that it did. If it did, the case is in no degree inconsistent with the views we have expressed with reference to the scope of the constitutional provision. If the case is not to be so rationalized, then we are of the opinion that the only plausible explanation of it is that, conceiving itself to be confronted by the very kind of transaction that had provoked or prompted adoption of the constitutional amendment, as it so clearly did, the court construed the provision in the light of its historical background and in such manner as to give effect to what the court conceived to be the will and intent of those by whom the provision was adopted. See, generally, 9 Tex. Jur., Constitutional Law, sec. 26, pp. 437–8. And if the case is to be so construed, we feel that application of it should be restricted to situations clearly comparable to the one that was before the court. It is unthinkable that it should be given the effect of prohibiting all business intercourse between municipal corporations and private corporations; yet, that virtually would be the result of saying that the word "appropriation" was not used in a special sense in the constitutional provision and that a municipality's revenues can in no event be appropriated in favor of a private corporation. No such effect can have been intended for the case, of course; nor was the constitutional provision itself designed for such a purpose.

Coming now to the matter of whether the contracts with which we are concerned are ultra vires for reasons dissociated from Article 11, Sec. 3, of the Constitution and therefore possibly also violative of that constitutional provision, we first note that the only theory advanced by appellants in the trial court or here for so holding is that, since the charter of the City of Beau-

mont expressly empowers the city to require the railroad companies to relocate their railroads and effect grade separations at rail and street intersections, it impliedly denies the city the power to expend its funds to accomplish these ends. That theory is no doubt the only one we are required to discuss, and it would probably be the better part of wisdom to confine our remarks to it, but we are nevertheless disposed to express our general reaction to the larger subject before disposing of the specific contention.

■ The city is vested by its charter with all powers of local self-government not inconsistent with the Constitution and general laws of the State. Therefore, assuming that neither the Constitution nor the general laws deny it the power to make the contracts in question, and disregarding for the moment the theory above noted, the only theory on which the contracts could be held to be ultra vires would seem to be that the city's undertakings are outside the bounds of legitimate city interest and endeavor. We are convinced that the undertakings are not of that nature. The city is vested by statute (art. 1175, subd. 16, V.T.C.S.) and its charter with "exclusive dominion, control, and jurisdiction" over its streets and is unquestionably empowered to expend its funds in improving them and in freeing them of obstructions. Under present conditions, the railroads are, in effect, hazardous street obstructions; and, still disregarding for the time being such powers as the city may have to compel the railroad companies themselves to alter the situation, we can see no significant difference between the city's paying for removal of the railroads and its paying for removal of any other hazardous obstruction. And if it has that right, as we think it does, we are aware of nothing that renders it powerless to pay in the manner and medium agreed upon. The fact that it is exchanging new right of way and a newly installed track for what Missouri Pacific Railroad Company is giving up, and that the right of way it is purchasing from

Texas and New Orleans Railroad Company is to be used in the exchange, should make no difference. The city is in no worse position than it would be if it had agreed to pay the companies the equivalent of the cost of the present method of handling so that the companies could themselves relocate the span of railroad. It is not entering into the real estate business or the contracting business or the railroad business. Its sole aim or purpose is to correct in part the untoward and unsafe conditions hereinabove described and to enable satisfactory and economical construction of the freeway. Both objectives are thought to be well within the scope of legitimate city interest and expenditure, and we are aware of no constitutional provision or general law that decrees otherwise.

The following cases from other states construing similar constitutional provisions support, in a general way, our construction of Article 11, Sec. 3, of our Constitution: Brooke v. City of Philadelphia, 162 Pa. 123, 29 A. 387, 24 L.R.A. 781; Chitwood v. City and County of Denver, 119 Colo. 165, 201 P.2d 605; Tocci v. New York, 73 Hun 46, 25 N.Y.S. 1089; Warm v. City of Cincinnati, 57 Ohio App. 43, 11 N.E.2d 281; Bailey v. City of Tampa, 92 Fla. 1030, 111 So. 119. And the following cases tend to support our views that the method of compensating Missouri Pacific Railroad Company—compensation by substitution—is legal: Fitzsimmons & Galvin v. Rogers, 243 Mich. 649, 220 N.W. 881; Austin v. Shaw, 235 N.C. 722, 71 S.E.2d 25; Dohany v. Rogers, 281 U.S. 362, 50 S.Ct. 299, 74 L. Ed. 904, 68 A.L.R. 434; Darwin v. Town of Cookeville, 170 Tenn. 508, 97 S.W.2d 838.

In contending that the city's own charter impliedly denies it the power to make the contracts in question, appellants invoke the maxim that the expression of one thing is exclusive of another (Expressio unis est exclusio alterius) and point to the following charter provision:

"Section 10 [Article 15]—Power to Regulate Tracks: The City Council shall have the power by ordinance to require any or all railroad companies operating any track or tracks upon or across any public streets of the City of Beaumont to reduce such tracks below the level of the streets intersected or occupied by such tracks, or to elevate such tracks above the level of the streets intersected or occupied by such tracks, and to require the company or companies owning or operating such tracks to provide necessary and proper crossing for the public travel at intersecting streets or to remove any tracks from any street occupied by such tracks and reroute same as designated in the ordinance, provided that the railway company involved be given thirty (30) days notice prior to adoption of the ordinance."

■■ The contention is not, we think, well founded. When the city's charter is considered as a whole, as it must be in appraising appellants' contention, we think it clear that the foregoing provision—whether treated as dealing with the police power or as a reservation of rights in connection with the grant of a franchise—was included to confer a cumulative power or to make clear that such power exists and not for the purpose of providing an exclusive means of dealing with the railroad problem. That purpose being manifest, the maxim upon which appellants rely—which is but a rule of construction to be applied in ascertaining intent—will not be permitted to defeat it. State v. Stone, Tex.Civ.App., 271 S.W.2d 741, 750–751; 39 Tex.Jur., Statutes, sec. 100, pp. 188–90.

We have thus far dealt with appellants' first and third points of error. They are both overruled.

■ Execution of the contract of December 17, 1957, was authorized by a mere resolution of the City Council, not by ordinance, and by their second point of error appellants contend that the contract is void for that reason. The point is overruled. There is no general provision in the city's charter providing what must be done by ordinance but the charter does from time to time provide that particular things shall be done by ordinance. The implication is that matters which are not specifically required to be dealt with by ordinance may be dealt with otherwise. And that implication seems to be in keeping with the general rule. 30–A, Tex.Jur., Municipal Corporations, sec. 282, p. 272; City of Waco v. Prather, 90 Tex. 80, 37 S.W. 312; Masterson v. Hedley, Tex.Civ. App., 265 S.W. 406; City of Kirbyville v. Smith, Tex.Civ.App., 104 S.W.2d 564; City of Nederland v. Callihan, Tex.Civ.App., 299 S.W.2d 380. Upon the theory that an act of permanent nature is involved, appellants say that City of Beaumont v Matthew Cartwright Land & Imp. Co., 224 S.W. 589, decided by this court, is directly in point and supports their position. Language that was adopted in the opinion from a brief lends force to the contention, but examination will disclose that actually the court was there construing a charter provision that did specify that the thing involved was to be done by ordinance. We are not here confronted by a situation of that kind. Moreover, no consequence can be attached to appellants' added contention that an ordinance should be required in order that a referendum provision of the charter may have application. The referendum provision does not purport to indicate what must be dealt with by ordinance.

■ Appellants next urge, under their fourth point, that the contract of December 17, 1957, shows upon its face that it is not the contract that was authorized by the resolution of the same date and that it is void for that reason. The contention is predicated upon the fact that by the resolution the City Council purported to authorize a contract then in being and before it, where as an exhibit that is attached to the contract and which forms a part of it shows not to have been prepared until

■■

December 31, 1957. The evidence shows without dispute that a rough draft of the exhibit that was finally attached to the contract was before the Council when the contract was adopted and that in its final form the contract is the contract that was authorized on December 17, 1957. The contract was not actually executed until after the final draft of the exhibit had been prepared. We think the matter presents no error; there was no unauthorized delegation of the Council's functions. Point four is accordingly overruled.

By their fifth point appellants urge that the contract of December 17, 1957, does not obligate the railroad companies to do anything and is therefore unilateral in nature and void. There might be merit to the contention if the contract stood alone, but such is not the case. The contract specifically refers to the work contract, the contract of January 29, 1958, for supplementation regarding the obligations of the railroad companies, and, when the two instruments are construed together, we think there can be no doubt that there is a valid consideration for the city's commitments. When the new span of railroad has been completed in accordance with the plans and specifications agreed upon, Missouri Pacific Railroad Company must accept it and yield up its old right of way. Point five is overruled.

Appellants' sixth point presents the contention that the city's undertakings are not within the purposes for which the bonds were voted in 1950. The affirmative of the proposition that was submitted to the voters was as follows:

"For the issuance of the serial bonds of the City of Beaumont for the purpose of paying part of the cost of the project for the elimination of railroad grade crossings from the public streets and highways in the City of Beaumont, and work and expenses appertinent to such separation of grades, and of paying the costs of constructing storm sewers in connection therewith, and

paying the cost of opening, widening extending and improving the public streets and highways in the City of Beaumont in connection therewith, and levying a tax in payment thereof."

We consider the proposition sufficiently broad to include what the city is doing, and so overrule the point of error. The proposition did not undertake to say how the grade separations were to be effected. That was left to be determined by the City Council, and that body has concluded that the desired results can best be effected by relocating the span of railroad. The paramount purpose of the City Council is to eliminate grade-level crossings and to open, extend and improve the city's streets, and the expense that is being incurred is part of the costs of doing those things.

By their seventh point appellants complain of the manner in which the bonds were advertised and sold, representing that there was not even a substantial compliance in this respect with the city's charter. We overrule the point without passing upon the merits of the question it presents. The matter can have no bearing upon the validity of either of the contracts in question or upon the city's right to discharge its commitments under the contracts; and to enable us to pass upon whether or not there was such failure to comply with the charter as affects the rights of the holders of the bonds, the holders would have to be parties to the suit, which they are not.

We do not consider the State an indispensable party to the defendants' cross-action, and so overrule appellants' eighth point of error. The cross-plaintiffs sought no relief inconsistent with the State's contract rights, nor was any granted them. In fact, the validity of the contract of January 29, 1958, was not directly in issue, nor was the proper construction of the contract in issue. The city sought to have its rights and powers under the Constitution and laws and under its charter and the bond proposition defined, and the judg-

ment of the trial court was restricted to those matters. The State was only indirectly interested in this controversy between the city and its citizens. Not being a party to the suit, its rights could not be prejudiced by the declaration. Article 2524–1, sec. 11. And, notwithstanding that the statute just cited provides that "all persons shall be made parties who have or claim any interest which would be affected by the declaration," we do not feel that it was a necessary party to the suit.

Appellants' ninth and last point is to the effect that the trial court erred in failing to grant them the ancillary injunctive relief for which they prayed. The point is disposed of by what has already been said and is overruled.

No reversible error having been presented, the judgment of the trial court is affirmed.

McNEILL, J., disqualified and not participating.

### On Motion for Rehearing.

Upon original submission of the case, under their point three, appellants emphasized the theory and maxim we discussed. However, they also urged, in a general way, that upon the undisputed facts, by exercising the powers expressly conferred by Section 10 of Article 15 of its charter, or by exercising the general police powers conferred by its charter and by statute, the city could have required Missouri Pacific Railroad Company to change the location of its railroad, and that the city was therefore without authority to assume any part of the expense of changing it. In their motion for rehearing, appellants emphasize the latter theory, urging that the contracts in question are for such reasons ultra vires and void and are therefore also within the prohibition of Article 11, sec. 3, of the Constitution. They refer us to the case of Houston & T. C. Ry. Co. v. City of Dallas, 98 Tex. 396, 413, 84 S.W.

648, 653, 70 L.R.A. 850, wherein it was said:

"All of the courts agree that the companies are not entitled to be paid the expense of doing those things which may properly be required of them by virtue of the police power to secure the safety of persons using the crossings, but differ as to what things are within that category."

The court was there referring to situations in which the police power is actually and validly exercised. It neither held nor intimated that a municipality can in no event lawfully assume the burden of doing that which, by exercising its police power, it could require another to do at such other's expense; nor has any authority asserting such a principle been cited us. Moreover, good reasons readily suggest themselves for supposing not only that the law is otherwise, but that the matter of whether a municipality shall itself do what it desires done or shall use its police power to compel another to do it is one that always rests in the sound discretion of the governing body of the municipality. But be that as it may, we cannot agree with appellants' contention that the evidence reflects a situation in which the city clearly could have required the railroad company to change the location of the span of railroad. The evidence went no further in that direction than to show a need for corrective measures and that grounds for invoking the police power existed. The practicality and reasonableness of requiring the railroad company to relocate its railroad as a corrective measure were not dealt with. The company could not have been compelled to do an impractical and unreasonable thing. Houston & T. C. Ry. Co. v. City of Dallas, supra, 98 Tex. 413, 84 S.W. 648; Lehigh Valley Railroad Company v. Board of Public Utility Commissioners, 278 U.S. 24, 49 S.Ct. 69, 73 L.Ed. 161, 62 A.L.R. 805. And since the city's right to compel relocation of the span of railroad was not certain, it cannot be success-

fully argued that because the city possesses the police power the contracts in question are without consideration. Nor do we think that the contracts impair the city's right to exercise its police power. On the record that is before us, the city not only had no clear right, but had no right at all, to compel the railroad company to make the contemplated change in the location of the span of railroad to which the contracts appertain. And the contracts do not otherwise affect the city's right to exercise its police power.

We again call attention to the case of Austin v. Shaw, 235 N.C. 722, 71 S.E.2d 25. Although some of the questions with which we have dealt were not therein expressly discussed, virtually all of them were necessarily involved. The facts of the case were almost identical with those in the case at bar. Also, see Knoxville Ice & Cold Storage Co. v. City of Knoxville, 153 Tenn. 536, 284 S.W. 866.

One additional matter requires discussion. Appellants say that we misinterpreted their eighth point, and it seems that we may have done so. Also, a closer examination of the record discloses that, contrary to what we said or at least intimated in the next to the last paragraph of the original opinion, the trial court did specifically adjudge both contracts to be valid. This was done on the basis of the cross-action that was filed by the city and its officers. Neither the State nor either of the railroad companies was named as a party to the cross-action and appellants say that the trial court was therefore without jurisdiction to pass upon the validity of the contract of January 29, 1958, which was not mentioned in the plaintiffs' petition. They perhaps also contend that the court was without jurisdiction to make other pronouncements that were made in the judgment. We deem the matter immaterial. The court had jurisdiction of the subject matter of the cross-action and of those who were parties to the cross-action. Strictly speaking, therefore, a jurisdictional question is not involved. The most that can be involved is an absence of indispensable parties. And it is not even necessary that that question be decided. Appellants' rights have not been adversely affected, even if the trial court exceeded its authority in rendering judgment on the cross-action. The matters adjudged on the cross-action were all implied in that part of the judgment that decreed that the plaintiffs take nothing. The contract of January 29, 1958, was properly before the court through the answers of the defendants and the evidence, and because it was, in effect, a part of the contract the plaintiffs themselves attacked, the contract of December 17, 1957. If any error was committed, it was harmless as regards appellants.

Appellants' motion for rehearing is overruled.