Corporation for the Relief of Widows, etc., *v.*
Philadelphia et al.

Argued December 7, 1934. Before Frazer, C. J.,
Simpson, Kephart, Maxey, Drew and Linn, JJ.

*Charles J. Biddle,* with him *Francis A. Lewis,* for plaintiff.

*Joseph P. Gaffney,* for Edwin R. Cox et al, members of Council of the City of Philadelphia.

*Henry S. Drinker, Jr.,* for Sinking Fund Commissioners.

OPINION BY MR. JUSTICE SIMPSON, January 7, 1935:

In this case, a bill in equity has been filed by a taxpayer and bondholder of the City of Philadelphia, to prevent the diversion of a fund of money from the sinking fund of the city to the general fund. The defendants are the city itself, its councilmen, the commissioners of the sinking fund, the mayor of the city, the city treasurer and various banks and trust companies who are depositaries of the sinking funds of the city. Because of the fact that the city is a party to the action, and of the importance of the questions involved, with the consent of the defendants we took original jurisdiction of the case, as we were authorized to do by article V, section 3 of the Constitution of the State. From the answer of defendants and the argument of counsel, it appears that the city, its mayor, and two of the three commissioners of the sinking fund align themselves with the plaintiff, while the city councilmen, the city treasurer and one of the commissioners of the sinking fund take the opposite view. The depositaries of the sinking funds did not answer, nor take any part in the proceedings.

The facts are not in dispute, but the conclusions attempted to be drawn from them are widely variant. It appears that the city paid $10,784,662 for and towards the construction of the Delaware River bridge, and obtained the money so to do by issuing bonds of the city in that amount. Out of tolls, the city received back, prior to the completion of the bridge, a portion of the

money which had been expended by it. When the bridge was completed, it was purchased by the Delaware River Joint Commission, under express statutory authority, and there was paid to the city the sum of $9,994,345.36 which was the adjusted balance of the money paid by the city to construct the bridge, its approaches, etc. For this sum, as already stated, the bonds oi the city had been issued, and were then and still are outstanding.

By an ordinance of the city council, approved March 29, 1934, $8,164,000 of that sum, which is correctly recited therein as "an asset that has been acquired out of a debt which is still outstanding," it is directed that it "be, and the same is hereby appropriated to the Commissioners of the Sinking Fund of the City of Philadelphia . . . for the acquisition of bonds for sinking fund purposes." The money was paid in accordance with this ordinance, and it, or the securities in which it has been invested, are still in the sinking fund. By an ordinance passed November 15, 1934, the council attempted to repeal the one of March 29, 1934, supra, and to appropriate the sum stated to the department of the city treasurer. This ordinance was sent to the mayor for approval or disapproval, but the council, probably learning that it was likely to be disapproved, recalled it for amendment. It was later amended, in a way not affecting the issues raised here, but has been held back awaiting the determination of this suit, which meanwhile had been begun to have the question at issue judicially determined.

At the argument, it was stated by counsel for all the parties in interest, that, if the ordinance of March 29, 1934, was valid and binding, plaintiffs were entitled to the injunction for which they prayed. To this question we will, therefore, first address ourselves. The only objection made to the ordinance is that the city controller had not certified, before its passage, that the $8,164,000, thereby appropriated to the sinking fund, was money received by the city during the year 1934 in

excess of the estimated receipts set forth in the budgetary ordinance of the city council for that year, as, it is alleged, article XVII, section 4 of the Charter Act of June 25, 1919, P. L. 581, 606, made a condition precedent to such appropriation. Although even a casual examination of the budgetary ordinance would probably have shown whether or not this large sum of $8,164,000 was in fact included in the estimated annual receipts stated therein, still, if the statute made a certificate of the city controller to that effect a condition precedent to the appropriation of the money to the sinking fund, we must enforce the provision.

The difficulty with defendants' contention is that it gives too great weight to a single clause in section 4, without considering either its context, the rest of this statute, or other relevant statutes. The first four sections of article XVII (P. L. 605, 607) after stating what the city council must do, when making up the budgetary ordinance for the ensuing year from an estimate of the probable receipts and expenditures for that year, made up by the city controller for the mayor and by the latter forwarded to the council, proceeds to set forth in section 4, P. L. 606, 607, the clause we are considering: "Any appropriation in violation of this article or in excess of the estimated receipts as set forth in said ordinance and any contract based thereon shall be void; *Provided, however, that the council shall have the power to appropriate money received in excess of said estimate, upon the certificate of the city controller that there has been such excess receipts.*" It seems to be conceded that no such certificate was given prior to the passage of the ordinance of March 29, 1934, and from this fact it is argued that the ordinance is void. With this contention we are not in accord. If we were to weigh the matter from the standpoint of the annual budgetary provisions of the act, we would be required to consider at least the first four sections of article XVII, for all four consecutively deal with the subject in its various

aspects, and only by considering all of them could we ascertain what is meant by "excess receipts" in the clause above quoted: verba generalia restringuntur ad habilitatem rei vel personam.

This limited inquiry, however, would not be sufficient in the instant case, for we are here concerned, not with excess receipts relating to budgetary matters, but with moneys realized from the sale of the city's interest in a permanent improvement. Since there are in the act express provisions relating to the subject under review, they necessarily control, so far as relevant, any general conclusion which might otherwise be deduced from the four sections of article XVII: Buckley v. Holmes, 259 Pa. 176, 188, 189; Davis's App., 314 Pa. 357, 362. These express provisions are found in section 8 of the same article of the statute, P. L. 609, and in article XVIII, section 8 thereof, P. L. 612, the former of which provides that "It shall be lawful for such city to borrow money or incur debt in accordance with the terms of existing law, for the purpose of . . . erecting buildings, *bridges,* or other structures (but not for the repair of the same), paving streets (but not repaving or repairing of the same), or for any other permanent improvements or capital outlay of any kind, provided that all of such proposed expenditures are certified to the council by the city controller to be capital expenditures as distinguished from current expenses, prior to the authorization of such debt." It is not necessary to inquire whether or not the city controller certified that the cost of building the Delaware River bridge was "a permanent improvement or capital outlay"—as to which point we have not been advised—since, in the nature of things, it was a "capital outlay," and since, also, all that the city did in connection with this work was properly done under special statutory authorization in relation to the erection of this particular bridge. We are told that, under the authority of this section, the city bor-

rowed the money and incurred the debt for the construction of the bridge.

Article XVIII, section 8 of the Act of 1919, P. L. 612, above referred to, provides that "Whenever any debt shall be or shall have been created for which the Constitution of this Commonwealth requires a sinking fund to be established [as article XV, section of our present Constitution, hereinafter quoted, does], the proceeds of the taxes levied for the payment of the principal and interest of such debt *and all other money pledged or appropriated for the payment of the principal and interest of such debt shall be paid into the sinking fund of such city, and shall be inviolably reserved for, and applied exclusively to, the payment of the principal and interest of such debt.* Whenever there shall be money in the sinking fund in respect of a particular debt in excess of the requirement for the payment, during the twelve months next ensuing, of principal maturing and interest due, such excess money shall be applied to the purchase and cancellation of such debt, but if at any time it shall be impracticable or financially disadvantageous to purchase such debt, such excess money may be invested temporarily in bonds or other evidences of debts" of the character specified in the balance of this section.

By the Act of June 12, 1931, P. L. 575, The Delaware River Joint Commission is authorized to purchase the bridge; and by article VI (c) it is required to pay the city for its interest therein "An amount equal to the moneys contributed by the City of Philadelphia toward the cost of acquiring property for and in constructing said bridge and the approaches thereto, actually paid by the City of Philadelphia or accrued upon the bonds issued by said city to borrow money to pay its share of the cost of acquiring property for and the construction of said bridge and the approaches thereto, and all expenditures incident thereto, less, however, the amount returned to the City of Philadelphia from the net reve-

nues of the bridge between July 1st, 1926 and June 30th, 1931, and less interest at the rate of 4¼ per centum per annum, upon such amount computed from the dates of repayment to the City of Philadelphia."

By section 3 of article XV of the Constitution of the State, it is provided that "Every city shall create a sinking fund, which shall be inviolably pledged for the payment of its funded debt," that is "all municipal indebtedness embraced within or evidenced by a bond, the principal of which is payable at a time beyond the current fiscal year of its issue, with periodical terms for the payment of interest: 27 C. J. 929, note 9 (a); 2 Words and Phrases Judicially Defined (2d series) page 684. As already shown, article XVIII, section 8, of the Act of June 25, 1919, supra, requires that "all . . . money pledged or appropriated for the payment of the principal and interest" of the debt incurred in the building of the bridge "shall be paid into the sinking fund of such city and shall be inviolably reserved for, and applied exclusively to, the payment of the principal and interest of such debt." Hence, when the ordinance of March 29, 1934, required the $8,164,000 to be paid into the sinking fund, it did only that which, entirely aside from the ordinance, was statutorily required to be done.

It was strongly urged by the leading attorney for defendants, that the city council had discretionary power in determining what should be done with the $8,164,000, because section 1 (e) of the amendatory Act of February 18, 1926, P. L. 10, 12, provides that the money paid to the city, in repayment of that advanced by her to construct the bridge, shall be as "the council of Philadelphia shall require." Assuming, although we think the law is otherwise, that the section and clause referred to, is controlling in this litigation, despite the fact that later statutes, already referred to, necessitate a different conclusion, we cannot reach the one contended for by him. The clause provides, so far as relevant here: "That

payments made under said contract . . . to the City of Philadelphia shall be made into such funds or to such persons as . . . the Council of Philadelphia shall . . . require." It will be noticed in the first place that there is no requirement here of a certificate by the city controller, and hence that provision in article XVII, section 4, of the Charter Act, supra, becomes unimportant. In the next place, by the Ordinance of March 29, 1934, supra, the Council of Philadelphia required the money to be paid into the sinking fund. This was a compliance with the above requirement of the Act of February 18, 1926, if it was still in force, and we are not advised of any authority to remove the money therefrom, after it has once reached its prescribed destination. At the argument we asked if there existed any authority to remove it, and counsel referred to none. We know of none. If the counsel's contention on this point is correct, then it must necessarily follow that the council may "require" that the money may be removed from one fund or person to another fund or person, backwards and forwards, until, in some stage of the proceedings it finally passes into outside hands. This surely cannot be. When the council required it to be paid into the sinking fund, and it was so paid, it had exhausted the power given to it by this statute, if it is applicable at all in the present situation of affairs.

From another standpoint the same conclusion would be reached. While the bridge was being constructed, the city desired to increase its funded debt. It thereupon applied to the court for leave to exclude from its total indebtedness then outstanding, so much thereof as represented money borrowed for the construction of the bridge, for which indebtedness the bonds of the city were then outstanding: In re Delaware River Bridge, 12 D. & C. Rep. 363. The basis of its contention was, in effect, that these bonds would ultimately be paid out of the purchase price of the bridge, and hence that part of the bonded indebtedness should be excluded

from the computation of the city's outstanding indebtedness. If this had not been done, the loan then contemplated could not have been made, because the then outstanding indebtedness would have been too great to permit it. That contention was sustained, and that portion of the debt was excluded in the computation. To allow the city's share of the purchase price of the bridge to be diverted to current expenses, in the way now sought, would be in the teeth of the contention made in that litigation, and would make its debt greater than is statutorily allowed. This, of course, cannot be permitted. If it was, the city might sell its interest in the subways, the elevated, convention hall, the stadium and any and every other improvement in which it is interested, spend the money for current purposes and leave unreduced the bonded indebtedness issued in connection with those improvements. As accurately stated by one of the counsel: "such a construction would permit the very pyramiding of the indebtedness" which it was the object of our Constitution and statutes to prohibit.

It follows that the $8,164,000, was properly appropriated to the sinking fund commission by the ordinance of March 29, 1934, and that it cannot legally be withdrawn therefrom and applied to other uses and purposes. We shall not, however, formally enter an injunction at this time. We are convinced, from the manner in which the case was argued, that however much the council may regret that they cannot use the $8,164,000 to help them out in this time of stress, they will nevertheless obey the law without being formally enjoined from doing otherwise. If, at any time in the future, it appears or seems likely that the municipal authorities will refuse to heed that which we have decided in this opinion, plaintiff has leave to prepare and present an injunction order of the character sought by the 1st, 2d, 3d, and 6th prayers for relief specified in the bill.