## Clark et al. *v.* Philadelphia et al.

522

Argued January 4, 1938.  Before KEPHART, C. J., MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Clarence G. Myers*, with him *Duane, Morris & Heckscher*, for petitioner.

*Joseph Sharfsin*, City Solicitor, with him *Abraham L. Shapiro, John P. Berry* and *Ernest Lowengrund*, Assistant City Solicitors, for respondents.

*Graham C. Woodward*, for City Treasurer.

*John Hampton Barnes* and *Selden Bacon*, with them *Joseph P. Gaffney, Townsend, Elliott & Munson, Saul, Ewing, Remick & Saul, Ferree Brinton, Mayer, Magaziner & Brunswick, H. Orvel Sebring, Jr., W. James MacIntosh, Morgan, Lewis & Bockius* and *Max M. Batzer*, for intervenors.

PER CURIAM, January 5, 1938:

We all agree that the Act of May 28, 1937, P. L. 951, is unconstitutional and of no effect.  An opinion stating the reasons for the decision will be filed in due course by

Mr. Justice LINN. Meanwhile counsel may submit a form of decree.

OPINION BY MR. JUSTICE LINN, January 17, 1938:

This is a class bill to enjoin the City from giving effect to the Act of May 28, 1937, P. L. 951, by consolidating the City's 44 sinking funds, and to require payment to the Sinking Fund Commissioners of the sum of $7,343,536 which had been certified by them as the amount required for the year 1938 by the City's loan contracts.

Plaintiff avers that he is a taxpayer and owner of a bond dated March 16, 1922, maturing March 16, 1972, redeemable at par and accrued interest at the expiration of 20 years or at any subsequent interest period, the bond being one of an issue of $1,050,000 sold to supply part of the cost of the Delaware River Bridge. The bill was based on various constitutional provisions, the City Charter Act, the sinking fund provision contained in the ordinance and the expenditure of the proceeds for bridge purposes. Plaintiff averred that, pursuant to proceedings recited in *Corporation for Relief of Widows, etc., v. Philadelphia,* 317 Pa. 76, 176 A. 727 (1935) the sum of $9,994,345.36 had been received by the City in reimbursement of expenditure for the bridge, and had been "duly transferred to the respective sinking funds securing Delaware River Bridge bonds"; that the "funds so repaid to the City and placed to the credit of the Delaware River Bridge bonds are irrevocably pledged for the security of said Bridge bonds and under the Constitution and laws of this Commonwealth, must be applied exclusively to the payment of the principal and interest of the said Bridge bonds." He averred that if the act is given effect, as proposed, such action "will cause the fund of upwards of $9,000,000.00, now in the Bridge Bond Sinking Fund, irrevocably pledged for the repayment of the Delaware River Bridge Bonds, to lose its identity as a trust fund, and to cause same

to be commingled with the other assets in the several sinking funds, so as to constitute a general credit against the total of the forty-four loans of the City"; that such action was in violation of the constitution, statutes and ordinances "and would impair the obligation of the City's several contracts with its bondholders." Leave to intervene, as parties plaintiff, was granted to various petitioners holding upwards of $90,000,000.00 of City bonds.

The City is obligated on 147 separate bond issues, par value $553,945,300.00,[1] issued pursuant to 44 separate authorizations. When the City borrowed, it, of course, agreed to repay. It is important to keep in mind that the right to borrow was not unrestricted; it had been conferred by the people subject to certain limitations contained in the Constitution: Article IX, sections 8[2] and 10[3]; Article XV, section 3.[4] Other terms and conditions governing the exercise of the right to borrow and, in part, defining the obligation to repay, are imposed by the City Charter Act of June 25, 1919, P. L. 581, Article XVIII section 8,[5] 53 P. S. section 3308.

---

[1] It may be noted that as much as $200,000,000.00 were authorized from the years 1925-1930 inclusive.

[2] "In incurring indebtedness for any purpose the city of Philadelphia may issue its obligations maturing not later than fifty (50) years from the date thereof, with provision for a sinking-fund sufficient to retire said obligations at maturity, the payment to such sinking-fund to be in equal or graded annual or other periodical instalments."

[3] "TAX TO LIQUIDATE MUNICIPAL DEBTS. Any county, township, school district or other municipality incurring any indebtedness shall, at or before the time of so doing, provide for the collection of an annual tax sufficient to pay the interest and also the principal thereof within thirty years." Increased to 50 years by the amendment of Section 8 in 1920.

[4] "CITY SINKING FUND. Every city shall create a sinking fund, which shall be inviolably pledged for the payment of its funded debt."

[5] "Whenever any debt shall be or shall have been created for which the Constitution of this Commonwealth requires a sinking-

The ordinances authorizing the loans contained the following sinking fund provision: "Whenever any loan shall be created by virtue of this ordinance there is, by force of this ordinance, an annual tax levied of $7\frac{4}{10}$ per centum of the par value of such bonds and certificates so issued to pay the interest also the principal of said loan, within 50 years, together with the state tax thereon; and the proceeds of the tax so levied are hereby annually appropriated as follows: To the Commissioners of the Sinking Fund a sum sufficient to pay the interest on said loan, also the principal thereof, within 50 years and as the same becomes payable, and to the City Treasurer a sum sufficient to pay the state tax thereon; the appropriation for the interest to be paid semi-annually, and for the sinking fund quarterly, to the said Commissioners."

The legal question raised by the bill and answers is whether the act is constitutional. It is entitled "An Act To provide for a sinking fund in cities of the first class in this Commonwealth; requiring the Sinking Fund Commission to establish the amount annually needed for such sinking fund and to transmit such estimate, or copy thereof, to the city council, the mayor

fund to be established, the proceeds of the taxes levied for the payment of the principal and interest of such debt and all other money pledged or appropriated for the payment of the principal and interest of such debt shall be paid into the sinking-fund of such city, and shall be inviolably reserved for, and applied exclusively to, the payment of the principal and interest of such debt. Whenever there shall be money in the sinking fund in respect of a particular debt in excess of the requirements for the payment, during the twelve months next ensuing, of principal maturing and interest due, such excess money shall be applied to the purchase and cancellation of such debt, but, if at any time it shall be impracticable or financially disadvantageous to purchase such debt, such excess money may be invested temporarily in bonds or other evidences of debt of the United States of America, of this Commonwealth, or of any county, city, borough, township, school district or other municipality or incorporated district of this Commonwealth."

and the city controller; making it the duty of the council to appropriate and provide the sum so estimated to be required; and repealing inconsistent legislation."

The purpose of the statute was not merely "to provide for a sinking fund," but to consolidate the existing sinking funds. Section 1, inter alia, provides: "It shall comprise and contain all the moneys, securities, bonds, and assets now in the several sinking funds of any such city, and all such moneys, securities, bonds and assets shall form a single fund to be used for the payment at maturity of all the bonded debts of such city, and all accretions and appropriations to the sinking fund of any such city hereafter to be made shall be paid to the Sinking Fund Commission and shall form part of said sinking fund. It shall be the duty of the Sinking Fund Commission each year to ascertain the amount needed with respect to the bonded debt of any such city requiring sinking fund payments, taking into account the requirements of each of said issues for the succeeding year, and having in view the dates and times of their respective maturities. The total of the needs of the sinking fund hereby established shall be thus ascertained and the Sinking Fund Commission, on or before the fifteenth day of August, in each year, shall transmit to the city council a certificate of the total requirements for the succeeding year for sinking fund purposes and shall send to the mayor and the city controller copies thereof. In formulating the financial program for the ensuing year, the council shall include therein an appropriation in the total amount so estimated to be required for the aforesaid purpose. At the maturity of the respective loans of any such city, so much of the sinking fund as may be needed for the payment thereof shall be drawn upon and used for their discharge as now provided by law."

In disposing of the case, it is unnecessary to deal with more than two of the objections made against the power of the legislature to effect the proposed consolidation:

(1) that a proper construction of the constitution requires a separate sinking fund for each loan authorized; and (2) that the terms of the City's loan contracts made pursuant to the Charter Act and the ordinances will not be performed unless separate funds are maintained; in short, that the consolidation would violate the constitutional provision against the impairment of the obligation of contracts.

While we all agree that prior decisions,[6] for reasons stated in the opinions filed, are predicated on the proposition that the constitutional provisions quoted require separate sinking funds, we have, out of deference to the argument presented by the learned city solicitor, and in recognition of the importance of the subject to the taxpayers, re-examined the question in the light of the argument presented, but we are obliged again to conclude that separate funds are required.

In dealing with the objection that the Act, if given effect, would impair the obligation of contracts, we have in the record a fact rarely presented in the consideration of such questions. This fact is that when the bill was presented to the Governor for approval or disapproval, he was advised by the Attorney General, that the bill was unconstitutional. From the Governor's message accompanying the approval of the act, we quote the following: "The Attorney General advises me that this bill violates both the State and Federal Constitutions, particularly since it is held to impair the contracted relationship between the city and the bondholders.

"The Delaware River Bridge Sinking Fund has recently been augmented by sale of the city's interest in the Bridge. This bill would permit diversion of that

---

[6] Among them, *Brooke v. Philadelphia*, 162 Pa. 123, 29 A. 387 (1894); *Schuldice v. Pittsburgh*, 251 Pa. 28, 95 A. 938 (1915); *Corporation for the Relief of Widows, etc. v. Philadelphia*, 317 Pa. 76, 176 A. 727 (1935) and *Sinking Fund Commissioners v. Philadelphia*, 320 Pa. 394, 182 A. 645 (1936).

money to other sinking funds and in the opinion of the Attorney General, would violate the city's contract with the Bridge bond-holders.

"However, S. Davis Wilson, Mayor of the City of Philadelphia, has advised us that in the opinion of the city solicitor of that city this bill is constitutional; that it will give needed relief to the taxpayers of Philadelphia by making unnecessary the appropriation in the year 1938 to the single sinking fund which it would create; that because of the city's financial condition, it is vitally important that the taxpayers be not required to contribute any more money to the liquidation of the city's bonded indebtedness than is absolutely necessary; and that if this bill is approved, the city will take immediate steps to see to it that its validity is passed upon by the Supreme Court of Pennsylvania at the earliest possible moment.

"Because of these representations I am signing this bill so that its constitutionality may be decided by the Courts."

What is the contract obligation which the bondholders contend will be impaired if the Act is given effect? "In determining what constitutes the obligation of a contract, no principle is more firmly established than that the laws which were in force at the time and place of the making of the contract enter into its obligations with the same effect as if expressly incorporated in its terms": *Beaver County Building & Loan Ass'n v. Winowich,* 323 Pa. 483, 489, 187 A. 481. As has been said: section 3 of Article XV requires a sinking fund "which shall be inviolably pledged for the payment of its funded debt"; section 8 of Article IX, permitting Philadelphia to "issue its obligations maturing not later than fifty (50) years from the date thereof," requires them to provide "for a sinking-fund sufficient to retire said obligations at maturity, the payment to such sinking-fund to be in equal or graded annual or other periodical installments"; section 10 requires provision "for the col-

lection of an annual tax sufficient to pay the interest and also the principal thereof within thirty years," the thirty year period being modified as to Philadelphia by section 8 as subsequently amended. Although these provisions are self-executing, the Charter Act, quoted above, also required that "the proceeds of the taxes levied for the payment of the principal and interest of such debt and all other money pledged or appropriated for the payment of the principal and interest of such debt shall be paid into the sinking-fund of such city and shall be inviolably reserved for, and applied exclusively to, the payment of the principal and interest of such debt . . ." A sinking fund is one "instituted and invested in such a manner that its gradual accumulations will enable it to meet and wipe out a debt at maturity," (New Standard Dictionary) it is a fund "specially earmarked for the extinction of a debt." Opinions, among them, that filed in *Brooke v. Philadelphia*, 162 Pa. 123, 128, 29 A. 387, quote Bouvier's definition: "A fund arising from particular taxes, imposts or duties, which is appropriated toward the payment of the interest due on a public loan, and for the gradual payment of the principal . . ." "The object of every sinking fund is to diminish the debt whose existence warranted its foundation": *Sidney, Spitzer & Co. v. Commissioners of Franklin County*, 188 N. C. 30, 123 S. E. 636. See also *Bank for Savings v. City of New York*, 102 N. Y. 313, 7 N. E. 162, 168. It therefore appears that the constitution, the statute and the ordinances providing for the loans, required an annual tax sufficient for the purposes stated. These, then, are among terms of the contract which the City agreed to perform; they are part of the obligation.

The sinking funds created for bonds issued many years ago, but not yet matured, necessarily have accumulated larger sums in the aggregate, "inviolably pledged for the payment of its funded debt" (Article XV, section 5) and "inviolably reserved for, and applied

530

exclusively to, the payment of the principal and interest of such debt" (Charter Act, Article XVIII, section 8) than the sinking funds created for more recently issued loans. It is obvious that the payments, so made from time to time, on account of the debt, constitute a positive benefit to holders of bonds of the particular issue so protected, and that they would not continue to enjoy the stipulated protection, if the credits resulting from the required payments on that particular debt were now diverted from their original purpose and the bondholders were relegated for their only security to the general taxing power of the City, as the City now in effect contends. If these funds are consolidated, the benefit of what has been so contributed to the older funds, must be shared by, and will enure to the benefit of, the holders of more recently issued bonds. This switching of benefits cannot be accomplished unless the City has reserved the right to compel the bondholders to submit to the change; but, as has been seen, instead of having the power to make such reservation, the right to issue bonds was expressly limited by the law as already stated. The City contends that no impairment of the contract will result because there was no pledge of specific property; that all the bondholder's contract gives him is the City's promise to pay at maturity with the right, on default, to have a court, in a proper proceeding, require the City to levy a tax then sufficient to pay its existing debts.

The record now before us does not call for decision of what may be done in case of default at some future time; when the occasion arises, the judgment of the court must necessarily depend on the circumstances then calling for adjudication.

The fallacy of the City's contention will more clearly appear if, for the purpose of testing the argument, we consider the credits to the separate sinking funds as composed of cash only, instead of cash and securities, as is the fact. The sinking funds established for the

older or earlier loans, having been accumulating credits for a longer time, would therefore have larger deposits of cash than sinking funds established for later loans. If, when the earliest loan matures, there should be a default and it should become necessary to levy a special tax to pay the amount due in excess of what had been accumulated in the sinking fund for the purpose of paying at maturity, the amount then to be raised by taxes would be merely the face of the loan less the cash in the particular sinking fund. On the other hand, if, instead of paying the agreed amount into each sinking fund, that amount is now reduced by diversion to other sinking funds (for example, the proposed redistribution of the credits in the sinking funds for the bridge bonds) a larger tax would be required at maturity of the older loan because the amount to be raised would be larger. This would be a violation of the contract. The loan holder has the right to insist that his contract shall not be changed so that the tax to be levied at maturity will be larger than would have been required if the contract had been performed as made; that is a valuable right and the vicissitudes of city budget-making and the difficulty of finding subjects of taxation afford some idea of its value to the bondholders. The practical effect on his right further appears in figures that may be referred to. The manner in which past administration of the sinking funds has affected the total of the outstanding indebtedness on any particular loan appears to be stated in the account entitled "EXHIBIT 'A' Schedule No. 50", in the brief of one of the intervening parties, and apparently taken from the published Annual Report of the City Controller to City Council for the year 1936. It is entitled: "Receipts, Disbursements and Balances of the Several Sinking Funds, with the Amount of Securities on Hand" as of December 31, 1936. For purposes of illustration, we abstract the following, selecting out of the 44 loans, three which differ in face value as little as the Exhibit allows. The $4,000,000.00

loan of 1906, with only $3,275,000.00 par value, out-
standing, had to its credit in cash and securities $2,632,-
467.20 or 80.38%, leaving only $642,532.80 (with in-
terest) to be raised by special taxation if an order for
that purpose had then become necessary. In the case
of the $4,000,000.00 loan of 1920, a more recent loan,
with $4,000,000.00 outstanding, the cash and securities
on hand were $2,724,860.22 or 68.12% with $1,275,139.78
and interest to be raised in case of default. The still
more recent $4,500,000.00 loan of 1929, with $4,500,-
000,00, par value, outstanding, had $758,582.57 in cash
and securities on hand or 16.85% with $3,741,417.43 and
interest to be raised. Those figures,[7] taken at random
from the account, state the City's construction of what
the contracts with the bondholders required as here-
tofore administered, and also show the practical value
of the loanholder's right to insist that the separate sink-
ing fund be kept as agreed.

If the City's contention that the Act is valid could
be accepted, how would performance of the contracts
differ for the future? Would the City continue to make
payment at the rate heretofore paid in accord with its
former recognition of the obligation of its contracts?
Not at all; the annual payments would be less, and to
the extent that they would be less, the contract would
not be performed. We are left in no doubt about this,
because we have the certificate of the three sinking fund
commissioners that the payments will be less. In their
official communication to City Council August 12, 1937,
the Mayor, the City Controller and Mr. Goodall, in
"transmitting herewith our [their] certification of the
total requirements for the year 1938 for Sinking Fund
purposes," said: "At the time of the approval of this

---

[7] The comparison is also affected by the fact that the maturity
dates of the first loan were July 1, 1937, January 1, 1938, July
1, 1939, and January 1, 1942; the maturity date of the second
loan is July 1, 1940; and of the third December 2, 1944, and June
1, 1947. See Controller's Annual Report for 1936, pages 77-79.

act by the Governor it was agreed that the act should be reviewed by the Supreme Court of Pennsylvania. If the Supreme Court holds the act to be constitutional, it will be unnecessary to appropriate any money to the Sinking Fund for the retirement of bonds for the year 1938. If, however, the court decides the act to be unconstitutional, it will be necessary for the Council to appropriate the sum of $7,343,536." In other words, it was proposed to discharge the City's admitted obligation to appropriate $7,343,536 for 1938, by redistributing the amount heretofore credited to the bridge bond sinking funds, notwithstanding the former decision of this court in *Corporation for the Relief of Widows, etc. v. Philadelphia*, 317 Pa. 76, 176 A. 727 (1935), expressly deciding that the obligation of the City's contract required that particular sum to be credited to those sinking funds.

One of the purposes of the proposed consolidation was to excuse the City from performing its contracts requiring, as the commissioners certified, the payment of $7,343,536 for 1938. If released from making that payment now, how can it be said that the obligation of the contracts has not been impaired? The contention of the City is thus stated in its brief: "In other words, since the Sinking Fund Commissioners have not only the right but the duty to invest the money in City bonds, it follows that the only effect of the sinking fund is to reduce the total outstanding indebtedness of the City represented by these bonds but as to each bondholder who retains his bonds, the face amount of his bond is still due. No default, however great, on the part of the City under these facts, could result in the bondholder being entitled to participate in a distribution of the funds since there are no funds in the hands of the Sinking Fund Commissioners, but only bonds, which, under the case of *Brooke v. Philadelphia*, [162 Pa. 123, 29 A. 387] are not again assertable against the City. For that, he has the general credit of the City as his primary

obligation. It, therefore, seems plain that the right of the bondholder extends to compelling the payment into the fund of the necessary amount but that once the amount is paid in and so long as the amounts themselves are not withdrawn from the fund, the handling of the funds is purely a matter of administration.

"*Brooke v. Philadelphia* and other cases, above cited, established as law what was or should have been actually the principle with regard to the Sinking Fund."

In dealing with that contention, the first question suggesting itself is: what is the sum of money which it is the commissioners' "duty to invest" in City bonds "to reduce the total outstanding indebtedness of the City represented by these bonds"? A general answer to that question appears in the constitutional provisions, the statute and ordinances referred to; for 1938 the amount certified as payable is $7,343,536, but which, the commissioners say, need not be paid if the contracts may be changed as proposed; a more specific answer to the question, as applied to the sum received for the Delaware River Bridge, was made in the decision of *Corporation for the Relief of Widows, etc. v. Philadelphia*, 317 Pa. 76, 176 A. 727. In the argument quoted, the City concedes the bondholders' right to compel payment of the necessary amounts into the sinking fund; the administrative "handling of the funds" (to use the words of the argument) is as completely governed by the contract as the right to compel payment. It would come as a great surprise, if the court adopted the City's contention that the loan contracts gave the bondholder no more than a mere right to call on the City to levy a tax when his bond matured, and that the contract requirement of annual payment for interest and amortization could be taken from him. The bondholder is entitled to the benefits of what the City, in the loan contracts, agreed to perform; to deprive him of this right is to impair the obligation of the contract. See *Western Saving Fund Society v. City of Philadelphia*,

31 Pa. 175 (1854); *Bruce v. Pittsburgh,* 166 Pa. 152, 30 A. 831 (1895); *Phila. Trust Co. v. Northumberland County Traction Co.,* 258 Pa. 152, 101 A. 970 (1917); *Beaver County Building & Loan Association v. Winowich,* 323 Pa. 483, 187 A. 481 (1936), and cases cited in that opinion.

This opinion is now filed pursuant to the formal order made in the case on January 5th.

Counsel will present a form of decree; costs shall be paid by defendants.