Schuchman et al. v. Pittsburgh et al.

Argued Jan. 18, 1945. Before Maxey, C. J., Drew, Linn, Stern, Patterson, Stearne and Jones, JJ.

*Charles F. C. Arensberg* and *Ella Graubart,* with them *Patterson, Crawford, Arensberg & Dunn,* for plaintiffs.

*Anne X. Alpern,* City Solicitor, and *Elder W. Marshall,* with them *James H. Beal, Jr.,* and *Reed, Smith, Shaw & McClay,* for defendants.

OPINION BY MR. CHIEF JUSTICE MAXEY, January 20, 1945.

Our decision is that Ordinances No. 312 and No. 313 of the City of Pittsburgh set forth in the Bill of Complaint and the proposed official actions of Cornelius D. Scully, Mayor of the City of Pittsburgh, and Edward R. Frey, Controller of the City of Pittsburgh, of signing and counter-signing the bonds referred to in the ordinances named and the proposed sale by the City of Pittsburgh, and the Mayor and Controller thereof, of the bonds of that city, authorized by those ordinances,

are not forbidden by the Constitution and are in accordance with the statutes of Pennsylvania, and the injunction which in the bill filed we are asked to issue against the City of Pittsburgh and the officials above named is therefore refused and the bill is dismissed. Each party to pay its own costs.

An opinion discussing the questions involved. in this case will be filed later.

OPINION BY MR. JUSTICE HORACE STERN, March 21, 1945:

On December 1, 1944, the Mayor of the City of Pittsburgh transmitted to the Council the departmental estimates for the city's requirements for the year 1945 amounting to $24,029,433, and an estimate of revenues of $24,014,906.[1] While this indicated an almost balanced budget the Mayor stated that there was an urgent need for increases of salaries and wages of city employes, for the creation of new positions, and for equipment, material and services necessary for the repair and maintenance of the municipality's physical plant, all of which would involve large additional expenditures. He expressed the opinion that the millage should not be increased and that the only alternative for raising the required revenue was by the issue of refunding bonds to liquidate a portion of the city's funded indebtedness maturing in 1945.

In response to this communication the Council, on December 4, 1944, enacted an ordinance fixing the millage at the same rate as previously, and on the same day passed the ordinances, No. 312 and No. 313, which are the subject of the present controversy. Ordinance No.

---

[1] Subsequently the Board of Property Assessment, Appeals and Review certified to the Controller the total assessed valuations of real estate for the year 1945 in a much less amount than for the previous year, thus indicating that the receipts from taxation would not reach the amount assumed by the Mayor.

312 directed the issuance and sale of bonds of the city in the amount of $600,000 for the purpose of refunding that amount of "people's" bonds maturing on March 1, and April 1, 1945. Ordinance No. 313 directed the issuance and sale of bonds in the amount of $900,000 for the purpose of refunding that amount of "councilmanic" bonds maturing on February 1, March 1, April 1 and May 1, 1945. Each of these ordinances recited that "There are now and will be insufficient assets in the respective sinking funds applicable to the payment of the principal of the aforesaid bonds at the time said bonds mature and are subject to redemption and payment by the City of Pittsburgh"; also that "In the opinion of Council, there will be a default in the payment of the principal of the bonds maturing as aforesaid within one year, unless refunding bonds of the City of Pittsburgh are issued for the purpose of redeeming the aforesaid bonds maturing during the year 1945." Both ordinances provided that "All assets in the sinking fund applicable to the payment of the principal of the bonds refunded shall first be so applied to the payment thereof, and thereafter the proceeds arising from the sale of the . . . refunding bonds shall be applied to the redemption of said . . . bonds maturing during the year 1945, and for no other purpose whatsoever."

On December 30, 1944, Council passed an appropriation ordinance which reduced the allotment for sinking fund purposes by the sum of $1,500,000 (that amount being provided for by the proposed sale of refunding bonds), and appropriated the larger part of that sum for increases of wages and salaries, for the establishment of new positions, and for repairs to sewers, bridges and other property and equipment of the city.

Plaintiffs, who are property owners and taxpayers of the City of Pittsburgh, filed a bill of complaint in the Court of Common Pleas of Allegheny County to restrain the city, its Mayor and Controller, from issuing and selling the two issues of refunding bonds in the

aggregate amount of $1,500,000 authorized by these ordinances. Answers to the bill were filed by defendants, but no material issues of fact were raised. Because of the importance of the case to the City of Pittsburgh and the need for a speedy decision we granted the petition of defendants to have a writ of special certiorari issue removing the record to this court for the purpose of having the matter considered here in the first instance. Our decision was handed down on January 20, 1945, and the present opinion is filed in pursuance of the decree then rendered.

The refunding bonds were to be issued under and by virtue of the authority conferred by the Municipal Borrowing Law of June 25, 1941, P. L. 159. Section 503 of that act provides that "Where any municipality has issued general obligation bonds either originally or for refunding purposes to secure any debt of such municipality which may have matured but remain unpaid and uncancelled or are about to mature and become payable and there is at the time or will, in the opinion of the council in the case of cities and boroughs and the corporate authorities in the case of other municipalities, be a default in the payment of principal thereon within one year, the municipality for the purpose of paying off such bonds may authorize, issue and sell refunding serial general obligation bonds bearing interest at a rate not exceeding six per centum per annum in addition to any taxes the payment of which may be assumed by the municipality, the maturity of any such bonds not to exceed twenty years after the date thereof, and not exceeding in the aggregate the amount of the bonds or other evidences of indebtedness so to be paid. All assets in the sinking fund applicable to the payment of the principal of the bonds proposed to be refunded shall first be so applied, and the balance of such issue only shall be redeemed by the issue of new bonds."

The provisions of the two ordinances under consideration comply in all respects with the conditions and directions thus prescribed. Plaintiffs, however, raise

questions regarding the interpretation of this section of the statute and as to its constitutionality. They contend that the condition that "there is at the time or will, in the opinion of the council . . . , be a default in the payment of principal thereon within one year" should not be construed so as to allow Council to entertain or express such an opinion if the revenues derived from taxation will be sufficient to liquidate the bonds maturing during the year and if a default in the payment of the principal will therefore arise only if all such revenues are devoted to the general needs of the city government instead of the amount required to meet the maturities being first placed in the sinking fund as provided by law.

The view thus advocated by plaintiffs is wholly untenable, for, if adopted, it would mean in effect that no refunding bonds could *ever* be issued and sold. It is inconceivable that the City of Pittsburgh or any other municipality will ever become reduced to such a desperate condition as to be unable to raise by taxation merely the amount needed to meet its sinking fund requirements, and, even if such a situation should materialize, it is obvious that no purchaser could then be found who would purchase refunding bonds issued under such conditions. Plaintiffs suggest that the statute would come into use in cases where "the bank in which the sinking funds were deposited closed, or where taxpayers were unable to pay their taxes because of a depression or other emergency, or where moneys in the sinking fund had been stolen". Surely the authority given by the Municipal Borrowing Law to refund maturing bonds was not intended to be limited to such extreme situations as those thus depicted. What was evidently intended was that the "default" which would give rise to the right to refund maturing bonds would occur whenever, in the opinion of Council, the taxes that could reasonably be levied and collected would be insufficient to meet the general operating expenses of the

municipality in addition to the sinking fund requirements. A city which, even if it liquidated its funded indebtedness, could not obtain sufficient revenues to operate its essential governmental activities, would automatically cease to exist.

It need scarcely be stated that this court is not concerned with the wisdom of the policy adopted in this instance by the Council of the City of Pittsburgh. Unduly burdensome taxation should, as far as possible, be avoided, but whether the millage rate in Pittsburgh has reached a practical maximum, whether the government of the city can be more economically administered, whether the need for increases in the salaries and wages of its employees and for the repair and rehabilitation of its plant and equipment is as urgent as represented, whether better methods of financing are reasonably available, are all questions for legislative, not judicial, consideration. If, in the judgment of the Council, the existing situation can be better met by issuing refunding bonds than by levying taxes sufficient, when added to the moneys in the sinking fund, to liquidate the maturing bonds, there is no right in a court to interfere with that judgment unless it involves a violation of law.

The attack upon the validity of the ordinances is based upon Article IX, section 10 of the Constitution, which makes it obligatory upon a municipality incurring any indebtedness to provide for the collection of an annual tax sufficient to pay the interest and also the principal thereof; and upon Article XV, section 3, which provides that every city shall create a sinking fund, which shall be inviolably pledged for the payment of its funded debt. Several statutes have been passed implementing these constitutional mandates, beginning with the Act of April 20, 1874, P. L. 65, sections 2 and 4, and extending down to the Municipal Borrowing Law of 1941, section 207 and Article IV. The Act of March 7, 1901, P. L. 20, for the government of cities of the second class, Article XIX, section 3, VII, and the amendatory

Act of June 27, 1913, P. L. 644, section 3, contain such provisions.[2] Moreover, the various ordinances under which the maturing bonds were issued in the present case observed these requirements by providing prospectively for the levy and assessment annually of a tax sufficient to pay the interest on the bonds and for a sinking fund for the payment of the principal as it became due, and the bonds themselves contained similar language. It is also true that the decisions of this court have time and again emphasized the inviolability of sinking funds for the redemption of municipal obligations and the need for scrupulous performance of the duty to deposit the required annual amounts into such funds from the tax revenues of the municipality. "That these constitutional provisions [referring, inter alia, to Art. IX, sec. 10] are mandatory and not merely directory, and are to be viewed in the light of limitations upon the powers to be exercised by municipalities, seems to us clear. They are safeguards in the interest of the taxpayer that must be observed": *Borough of Rainsburg v. Fyan,* 127 Pa. 74, 77, 17 A. 678, 679. "No temptation however great, no necessity however imperious, shall move the city to divert one dollar of the [sinking] fund to a purpose other than the redemption or payment of the debt": *Brooke v. Philadelphia,* 162 Pa. 123, 130 29 A. 387, 390. "The section [Art. IX, sec. 10] is an explicit and express command to subdivisions of government to perform a duty, a duty which may be enforced by mandamus": *Ohlinger v. Maidencreek Township,* 312 Pa. 289, 293, 167 A. 882, 884. More recent affirmations of these principles are to be found in *Corporation for the Relief of Widows v. Philadelphia,* 317 Pa. 76, 176 A. 727; *Sinking Fund Commissioners of Philadelphia v. Philadelphia,* 320 Pa. 394, 182 A. 645; *Clark v. Philadelphia,* 328 Pa. 521, 196 A. 384. All these cases and numerous others make it perfectly clear that, after levy made

---

[2] The so-called Charter Act of June 25, 1919, P. L. 581, Art. XVIII, section 2 and section 8, contain similar provisions for the City of Philadelphia.

and tax collected and deposited to the credit of the sinking fund, the fund thus appropriated cannot be diverted to other purposes. But here no question is involved as to the integrity of any of the sinking funds of the City of Pittsburgh, nor has there been any diversion of moneys from those funds or from any tax levies required to liquidate the city's funded indebtedness. The moneys in the sinking funds applicable to the payment of the maturing bonds are to be used for that purpose. There has been no breach of the contracts entered into with the bondholders, for obviously it makes no difference to them from what source the money is derived which is to be used for the payment of their bonds.

There is nothing in the Constitution or statutes of Pennsylvania which requires that the funded indebtedness of a municipality shall be paid *only* out of moneys derived from taxation and accumulated in the sinking funds. On the contrary, beginning with the Act of April 20, 1874, P. L. 65, sec. 7, passed contemporaneously with the adoption of the Constitution, there have been numerous statutory enactments providing for the refunding of municipal indebtedness. Such an act, for example, was that of April 14, 1881, P. L. 10, which was extended to cities of the first and second classes by the amendatory Act of March 1, 1899, P. L. 6; other examples are the Acts of January 5, 1934, P. L. 218, and May 9, 1935, P. L. 155. Thus we find a series of statutes running side by side with those providing for the maintenance and integrity of the sinking funds, and between these two chains of enactments there is no conflict or inconsistency; they establish two different methods of liquidating the maturing bonds of municipalities, the one method, that of refunding, to be used only under the circumstances and conditions specifically prescribed.

A refunding operation does not increase the municipal indebtedness but is merely a continuation thereof; it is not the creation of a new debt in ascertaining the constitutional limit of two per centum of the assessed valuation of property beyond which the debt cannot be

increased except by a vote of the people: *Hirt v. City of Erie,* 200 Pa. 223, 49 A. 796; *Schuldice v. Pittsburgh,* 234 Pa. 90, 99, 82 A. 1125, 1128; *Madden v. Borough of Mount Union,* 322 Pa. 109, 117, 185 A. 275, 278. Therefore it need not be submitted for approval by the electorate; the bonds which refund so-called "people's" bonds adopt their character as electoral indebtedness: *Commonwealth v. Cannon,* 308 Pa. 321, 162 A. 277. The Municipal Borrowing Law itself provides, section 501, that "Funding and refunding bonds may be authorized, issued and sold without the assent of the electors. General obligation bonds issued to fund or refund bonds issued or debt incurred with the assent of electors shall evidence debt incurred with the assent of electors."

It is urged upon us that a policy of refunding indebtedness instead of liquidating it through taxation encourages extravagance. But Article IX, section 8 of the Constitution limits the lawful indebtedness of municipalities to a prescribed percentage upon the assessed value of the taxable property, and, as long as that limit is not exceeded,[3] those who drafted and the electors who approved the Constitution apparently deemed it of minor importance over what duration of time a municipality might choose to remain in debt. It was evidently anticipated that there would come times and occasions when municipalities, like individuals, might be obliged, because of straitened financial circumstances, temporarily to renew outstanding obligations instead of being obliged to liquidate them out of shrunken tax revenues.

For the reasons indicated the Court decided, as set forth in its decree of January 20, 1945, that ordinances No. 312 and No. 313 of the City of Pittsburgh, and the issue and sale of the bonds therein authorized, are not forbidden by the Constitution or the statutes of Pennsylvania, and accordingly the injunction prayed for was refused and the bill of complaint dismissed.

---

[3] The indebtedness of the City of Pittsburgh is well within the constitutional limit.

DISSENTING OPINION BY MR. JUSTICE DREW:

I am unable to agree with the majority.

In 1940 the City Council of Pittsburgh refunded $2,398,000 of "electoral" bonds; in 1944 it refunded $1,000,000 of "electoral" bonds; the ordinances challenged in this case provide for the refunding of an additional $600,000 of "electoral" bonds. As a result of these refunding operations the City Council of Pittsburgh has borrowed approximately $4,000,000 for current expenses without increasing its "councilmanic" debt and without decreasing its "electoral" indebtedness.

Does the Constitution of Pennsylvania require the indebtedness of a municipality to be liquidated, or may its debt, by a process of refunding, continue outstanding indefinitely?

The Constitution sets two limits on the debt of municipalities. Article IX, Section 8, limits the debt which can be incurred to 7% of the assessed valuation of the taxable property. Of this 7% only 2% can be borrowed without the consent of the electors.

Article IX, Section 10, and Article XV, Section 3, are concerned with liquidation of the debt. They provide that before or at the time of incurring an indebtedness a municipality must provide "for the collection of an *annual tax* sufficient to pay the interest and also the principal thereof within thirty years". (Italics added.) Every municipality is required to "create a sinking fund, which shall be *inviolably* pledged for the payment of the debt".

The Municipal Borrowing Act of 1941 requires that taxes collected each year shall be deposited in the sinking funds for the payment of outstanding bonds. Section 503 of the Act, which is concerned with refunding, says that "All assets in the sinking fund applicable to the payment of the principal of the bonds to be refunded shall first be so applied." But, in this instance the City did not deposit any taxes in the sinking funds and there

were therefore no assets in the sinking funds to apply to the payment of the bonds.

The statement in the majority opinion that "The moneys in the sinking funds applicable to the payment of the maturing bonds are to be used for that purpose" is meaningless.

The result of the decision in this case is that taxes need not be levied each year to pay off the debt, and that the debt need not be liquidated in thirty years; that by the device of refunding, the City can keep the outstanding indebtedness indefinitely unliquidated.

This is a clear violation of the Constitution. It also offends the laws of sound financing. The kind of refunding now legalized in Pennsylvania by the decision in this case will permit municipalities to obtain money for current operations which should be used to liquidate their bonded indebtedness. Municipalities in Pennsylvania are no longer compelled to reduce and pay their funded debt.

This Court has repeatedly said that these Constitutional provisions are mandatory: *Ohlinger v. Maidencreek T.*, 312 Pa. 289, 167 A. 882; *Campbell v. Wilkins Twp.*, 273 Pa. 204, 116 A. 823.

In *Brooke v. Philadelphia*, 162 Pa. 123, 29 A. 387, Mr. Justice DEAN, speaking for the Court, page 129, said:

"Then came section 3, article 15 of the constitution of 1874, which directs that: 'Every city shall create a sinking fund which shall be inviolably pledged for the payment of the public debt'. 'Every city shall create a sinking fund,'—that is, there shall be set apart from all other city money, for a specific purpose, the redemption or payment of the funded debt, a portion of the annual revenues of the city; then, when this portion of the revenue reaches the fund, it is inviolably pledged for the payment of the funded debt. No temptation however great, no necessity however imperious, shall move the city to divert one dollar of the fund to a purpose

other than the redemption or payment of the debt".
And on page 130 he added: "So far, then, as relates to
the general public, . . . what is called the sinking fund
is the mere conduit, through and by which the money
raised by annual taxation reaches its destination; it
goes into the fund for a specific purpose, to which it is
inviolably pledged, . . ."

All this has now been completely ignored and over-
ruled. Instead a municipality is now permitted to di-
vert annual taxes from the sinking fund and use them
for other purposes. In other words the method pre-
scribed by the Constitution for the payment and reduc-
tion of the funded indebtedness is entirely set aside.

The framers of the Constitution were concerned not
only with the payment of the funded debt but also with
an annual reduction of the debt. The contention of the
City is that the money received from refunding goes
into the sinking fund for payment of the bonds, and
that this satisfies the Constitutional requirement. This
argument loses sight of the fact that the Constitution
requires annual taxes to be used for payment of the
debt and requires the debt to be reduced annually and
completely liquidated in thirty years.

In *Clark v. Philadelphia,* 328 Pa. 521, 196 A. 384,
where a statute had been passed by the legislature con-
solidating forty-four sinking funds of the City of Phila-
delphia, this Court held that the statute was unconsti-
tutional, and concluded: "It therefore appears that
the constitution, the statute and the ordinance provid-
ing for the loans, required an annual tax sufficient for
the purposes stated. These, then, are among terms of
the contract which the City agreed to perform; they are
part of the obligation."

In this case sixty-two issues of bonds are being re-
funded by the City of Pittsburgh. Each of the ordi-
nances creating the bonds which are now being re-
funded contained a provision for the levy and assess-
ment of an annual tax for the payment of the bonds.
This obligation is part of the contract made by the
City: *Brooke v. Philadelphia,* supra.

The vice of such refunding is demonstrated in the record before us, which shows the refunding of $50,000 of bonds of the City of Pittsburgh which were issued in 1944 to refund bonds which became due that year. The kind of refunding approved by the decision in this case will surely result in a procession of refunding by many municipalities. The device is nothing better than a rotation of refunding bonds, which can be carried to the point where all bonds of a municipality are refunded and none are ever paid.

By the same device a municipality which has reached its limit in borrowing power may continue indefinitely obtaining money for current expenses by using taxes which should go to liquidation of its bonds.

I do not believe that the Municipal Borrowing Act of 1941 was intended to permit unlimited refunding. Article 5 of the Act contains provisions for funding and refunding bonds. Section 503 provides that where, in the opinion of the council, there is or will be a default in the payment of principal of funded bonds, the municipality for the purpose of paying off such bonds may issue and sell refunding bonds. The default contemplated is a default "in the payment of the bonds". This means that although a tax has been levied and appropriated to the sinking fund it is not sufficient to pay off the bonds when they mature. This would occur only in an emergency, as for instance, where there has been a great failure of taxpayers to pay their taxes, or where a bank in which the sinking funds were deposited failed, or some such unexpected happening over which the municipality had no control. Such an emergency existed in *Com. ex rel. v. Cannon,* 308 Pa. 321, 162 A. 277. There, because of a great economic depression the County of Cambria was unable to pay its bonded debt and was permitted to refund. President Judge Mc-Cann, in his opinion, said: "The situation confronting the County Commissioners is an urgent need to relieve an almost intolerable financial burden resting upon the County.

"This situation is brought about, in part by the collapse of the coal trade, which has reduced this County from one of the richest in the State to a condition of financial stringency, and in part by the world wide depression, the latter having resulted in economic distress in Cambria County of such severe nature and far reaching extent as to tax seriously the ability of the County to look after its unemployed by the extending of relief in the most insignificant amounts.

"The County is scarcely able to carry on its most needed functions. Our Courts have been suspended for a period of several months as a necessary economy move, and the outlook for the immediate future is indeed dark."

I cannot believe that the legislature in speaking of a default meant that council could divert taxes inviolably pledged for the payment of bonds to current expenses and describe the result as a default in the payment of bonds. The default contemplated by the statute is certainly one over which council has no control. The default announced by the City of Pittsburgh in Ordinances 312 and 313 is one which council created. The Municipal Borrowing Act, Section 503, does not permit the municipalities of the Commonwealth to create a default in every issue of bonds as they mature by diverting the taxes pledged for the payment of the bonds to the payment of current expenses or other obligations.

It may well be that the City of Pittsburgh needs additional revenue for current expenses. If so, there are a number of methods known to the law by which such need can be supplied. To accomplish the result it is not necessary to nullify the Constitution and place municipal finances on an unsound basis. So far as Pittsburgh is particularly concerned it is well within its debt limitation, and in the usual legal way, by increasing its indebtedness, can obtain the money it needs.

Mr. Justice LINN joins in this dissent.