

# THE ATTORNEY GENERAL
# OF TEXAS

AUSTIN 11, TEXAS

WILL WILSON
ATTORNEY GENERAL

August 3, 1959

Hon. Bill Allcorn, Commissioner     Opinion No. WW-678
General Land Office
Austin 14, Texas                  Re: Authority of Veterans'
                                     Land Board to purchase
                                     and cancel State of
                                     Texas Veterans' Land
Dear Sir:                                   Bonds.

You have requested an opinion as follows:

"Our Accounting Department advises that the
Veterans' Land Board Division A Fund cash bal-
ance is increasing from an accumulation of
monies received from such sources as Paid in Full
Contracts, Bonuses, Gravel and Timber Sales,
Homesite Purchases, etc., in an amount consider-
ably above our anticipated receipts from these
sources. These additional receipts are over and
above those normal anticipated receipts required
as bond reserves and to retire the bonds and to
pay interest as it falls due.

"From time to time, the Veterans' Land Board
is offered the opportunity to purchase bonds
sold as Texas Veterans' Land Bonds Series 1949,
1950, and 1950A. The Veterans' Land Board Divi-
sion A Fund mentioned above is the Fund in the
State Treasury in which the proceeds of the sale
of the above series of Texas Veterans' Land Bonds
are deposited. Returns from the purchase and re-
sale of land to veterans and receipts from other
sources related to this Fund are also deposited
to the credit of this Division A Fund.

"The Veterans' Land Board has authorized me
to present to you the following questions for an
official opinion:

1.  Is the Veterans' Land Board authorized
to purchase and cancel Texas Veterans'
Land Bonds from Series 1949, 1950, and
1950A in the open market at a price that
does not exceed par, with funds which are
now deposited in Texas Veterans' Land
Fund Division A?

2.  If the answer to question #1 is in the
affirmative, is the Veterans' Land Board
authorized to purchase and cancel bonds
from other series and other funds, after
the specified date in each specific bond
resolution, after which the Veterans' Land
Board cannot use any of the funds for the
purchase of land for resale to Texas veterans,
but must use all the receipts from any
sources for the purpose of maintaining re-
quired bond reserves and payment of interest
and principal on the outstanding bonds?"

Pursuant to the provisions of Section 49b of Article III
of the Constitution of Texas as adopted November 7, 1946, and
Senate Bill No. 29, Chapter 318, Acts of the 51st Legislature,
Regular Session, 1949, (Art. 5421m, V.C.S.) the Veterans' Land
Board issued $25,000,000.00 in negotiable bonds for the purpose
of creating a fund known as the Veterans' Land Fund to be used
for purchasing land to be resold subsequently to Texas Veterans
of World War II.

These bonds were issued and sold in three installments,
as follows:

(a)  State of Texas Veterans' Land Bonds,
Series 1949, dated October 1, 1949,
in the amount of $5,000,000.00.

(b)  State of Texas Veterans' Land Bonds,
Series 1950, dated April 1, 1950,
in the amount of $10,000,000.00.

(c)  State of Texas Veterans' Land Bonds,

Series 1950-A, dated August 1, 1950,
in the amount of $10,000,000.00.

We have re-examined the transcripts of proceedings underlying the issuance of these bonds, including the resolutions by the Veterans' Land Board authorizing their issuance, and your first question is answered in the affirmative, provided the required "Reserves" are maintained intact and, in addition, adequate moneys are retained in the proper division of the Veterans' Land Fund to provide for the prompt payment of the principal of and interest on each of the outstanding bonds when due.

The reserves which must be maintained intact for each of these three issues, respectively, in accordance with covenants contained in the resolutions are as follows:

(a)   Series 1949, $600,000.00

(b)   Series 1950, $1,200,000.00

(c)   Series 1950-A, $1,200,000.00

The constitutional provisions, the statute, and the resolutions of the Board all provide that from and after November 25, 1954, (8 years after the effective date of the constitutional provision) no money in the Veterans' Land Fund can be used except to pay the principal of and interest on the bonds. The purchase of these bonds prior to their maturity by the Board at a price not exceeding their face value is consonant with such specified use of the Fund and constitutes nothing more than the purchase of outstanding bonds with moneys coming from the applicable interest and sinking fund.

It is clear that this portion of the Veterans' Land Fund, after the expiration of the 8-year period, is an interest and sinking fund. It is a fund specially earmarked for the extinction of a debt, and the object of every such fund is to diminish the debt whose existence warranted its foundation. Clark v. City of Philadelphia, Supreme Court of Pennsylvania, 196 A. 384, 387, 388; 328 Pa. 521. Bank for Savings v. Grace, 7 N.E. 162, 168; 102 N.Y. 313.

At the time these "Division A" bonds were issued Section 9 of Article 5421m, V.C.S., provided, in part, as follows:

> ". . . After eight (8) years from the effective date of said constitutional amendment, all moneys received by the Veterans' Land Board under the terms of this Act, or so much thereof as may be necessary, shall be set aside and used to pay principal and interest on bonds then outstanding as they shall mature . . . The moneys so set aside . . . may be invested by the Board in bonds of the United States, or the State of Texas, . . ."

The 55th Legislature, Regular Session, 1957, added Section 2(A) to this statute, which, in part, provides:

> "The duties of the Veterans' Land Board . . . shall be . . . to formulate such policies, rules and regulations as may be necessary, not in conflict with the provisions of the law, to insure the proper administration of the law and to carry out the intent and purposes thereof."

This is a broad grant of discretionary power to the Board to properly administer the program. For example, when an opportunity is presented to the Board to purchase its own bonds at a price less than their face value, because the bonds have an attached interest coupon which is then considered "low" due to the fluctuations of the bond market, it would obviously constitute "proper administration" for the Board to purchase and cancel those bonds, thereby retiring that portion of the debt prior to maturity and realizing substantial savings in interest cost and principal as compared with the amounts which the Board would otherwise remain obligated to pay.

The Legislature, in using the words "as they shall mature", was merely declaring that the Board must set aside such moneys -- "so much thereof as may be necessary" -- in order that no bond obligation would remain unpaid when due.

Such a default obviously could not occur in the case of a bond which had been purchased by the Board and cancelled prior to its maturity date.

We find nothing in the Constitution, the statute or in the bond resolutions which either expressly, or by implication, limits the authority of the Board to follow such an obviously appropriate course of action, provided the Fund is not depleted so as to interfere with the prompt payment when due of those obligations which remain outstanding.

It is the duty of the Veterans' Land Board, insofar as the inflow of money into the Veterans' Land Fund will permit, to assure the availability of sufficient money in the Fund so that the principal of and interest on each bond not so purchased and cancelled prior to maturity will be promptly paid when due. The Board has recognized this obligation. For example, in advertising the bonds for sale in a nationally circulated financial publication, and inviting bids for purchase of the bonds, the Board authorized the following statement:

> "It is anticipated that there will be some credit margin between the amount of payments which will be received from the land notes and the interest and principal payments which the State will be required to make on the Bonds. . . . The Reserve deposited and accumulated in the Fund will be further assurance."

Section 49-b of Article III of the Constitution of Texas was amended in 1951 and again in 1957, authorizing additional bonds in the amounts of $75 millions and $100 millions, respectively. Purusant to these amendments bonds have been issued by the Board in installments as follows:

1951 Amendment

 (a) State of Texas Veterans' Land Bonds, Series 1951, dated December 1, 1951, in the amount of $15,000,000.00.

(b)    State of Texas Veterans' Land Bonds, Series 1952, dated October 1, 1952, in the amount of $10,000,000.00.

(c)    State of Texas Veterans' Land Bonds, Series 1953, dated April 1, 1953, in the amount of $10,000,000.00.

(d)    State of Texas Veterans' Land Bonds, Series 1953-A, dated September 1, 1953, in the amount of $15,000,000.00.

(e)    State of Texas Veterans' Land Bonds, Series 1954, dated April 1, 1954, in the amount of $15,000,000.00.

(f)    State of Texas Veterans' Land Bonds, Series 1954-A, dated September 1, 1954, in the amount of $10,000,000.00.

1957 Amendment

(a)    State of Texas Veterans' Land Bonds, Series 1957, dated December 1, 1957, in the amount of $12,500,000.00.

(b)    State of Texas Veterans' Land Bonds, Series 1958, dated April 1, 1958, in the amount of $12,500,000.00.

(c)    State of Texas Veterans' Land Bonds, Series 1958-A, dated July 1, 1958, in the amount of $12,500,000.00.

Thus, of the authorized total of $200,000,000.00 a total of $137,500,000.00 of bonds has been issued and sold.

The $75 millions of bonds authorized by the constitutional amendment of 1951 are serviced by Division B of the Veterans' Land Fund; the $100 millions of bonds authorized in 1957, $37.5 millions of which have been issued and sold, are serviced by Division C of the Fund.

We have also re-examined the transcripts of proceedings pertaining to all the "Division B" issues and "Division C" issues and your second question is affirmatively answered, provided similar duties and precautions are observed by the Board as mentioned in the answer to your first question and the bonds are purchased at a price not exceeding their face value, except that funds in Division B of the Fund may not be used for such purchase of Division B bonds until after December 1, 1959, and the corresponding date for the Division C bonds is December 1, 1965.

### SUMMARY

The Veterans' Land Board may purchase and cancel State of Texas Veterans' Land Bonds provided certain duties and precautions are observed by the Board.

Yours very truly,

WILL WILSON
Attorney General of Texas

By Howard W. Mays
Howard W. Mays
Assistant

HWM-s

APPROVED:

OPINION COMMITTEE:
Geo. P. Blackburn, Chairman

C. K. Richards
Linward Shivers
Robert G. Scofield

REVIEWED FOR THE ATTORNEY GENERAL
By: Leonard Passmore